WEST JERSEY AND SEASHORE RAILROAD COMPANY, AP-
PELLANT, v. BOARD OF PUBLIC UTILITY COMMIS-
SIONERS, RESPONDENTS.

Submitted December 5, 1914—Decided April 22, 1915.

1. The primary purpose intended to be accomplished by the legis-
lative requirement that all leases proposed to be made by rail-
road companies of this state should be submitted to the board
of public utility commissioners for its approval, is not merely to
furnish a means of ascertaining whether or not in a given case
the conditions exist under which the statutes of the state author-
ize such leases to be made, and whether or not the statutory pro-
cedure with relation thereto has been followed, but to provide a
method for preventing the making of leases embracing provisions
inimical to the interests of the state or omitting provisions which
are requisite for the protection of those interests.
2. The delegation by the legislature to an agency created by it of
the power to approve or refuse to approve a lease proposed to be
made by a railroad company of this state (such power being
vested in the legislative agent for the purpose above indicated)
is not repugnant to constitutional provisions.
3. The act concerning public utilities is not a special law conferring
corporate powers upon the board of public utility commissioners
created by it.
4. The power conferred upon the board of public utility commis-
sioners to approve or refuse to approve a lease proposed to be
made by a railroad company of this state is discretionary in its
character; and, this being so, the Supreme Court cannot substi-
tute its own judgment for that of the board and compel the latter
by *mandamus* either to grant or to withhold its approval thereof.

On appeal from a judgment of the Supreme Court, whose
opinion is reported in 85 *N. J. L.* 468.

For the appellant, *Alan H. Strong.*

For the respondent, *Frank H. Sommer.*    .

The opinion of the court was delivered by

GUMMERE, CHIEF JUSTICE. This appeal is taken from a judgment of the Supreme Court, sustaining a demurrer to an alternative writ of *mandamus,* sued out by the West Jersey and Seashore Railroad Company against the board of public utility commissioners, to compel that board to approve a lease proposed to be made by the relator of its railroad and franchises to the Pennsylvania Railroad Company. The determination of the case involves, a consideration of two questions—*first,* the scope of the power of the board when acting upon an application for its approval of a lease by one railroad company to another, and *second,* the question of the supervisory power of the Supreme Court over the action of the board in dealing with such an application.

First, as to the scope of the power of the board.

That body was created by the act of April 21, 1911, entitled "An act concerning public utilities; to create a board of public utility commissioners, and to prescribe its duties and powers." *Pamph. L., p.* 374. That act, after conferring upon the board general supervision and regulation of, jurisdiction and control over, all public utilities, so far as might be necessary for the purpose of carrying out the provisions of the act, and defining a "public utility" as any individual, copartnership, corporation or joint stock company owning, operating or controlling, within the State of New Jersey, any steam railroad, street railway, traction railway, canal, express, subway, pipe line, gas, electric light, heat, power, water, oil, sewer, telephone, telegraph system, plant or equipment for public use, under privileges granted by the state, or by any political subdivision thereof, declares (section 18) that no public utility as therein defined "shall * * * *without the approval of the board* lease * * * its property, franchises, privileges or rights, or any part

thereof," and that "every lease * * * made in violation of any of the provisions hereof shall be void and of no effect."

Counsel for the appellant contends that the limit of the power of approval thus conferred is to determine "whether the conditions exist under .which the statute authorizes a lease to be made, and whether the statutory procedure with relation thereto has in all respects been followed." An examination of the legislative enactments bearing upon the authority of a railroad company of this state to lease its property and franchises will, we think, show the fallacy of this contention.

Prior to 1873 all the railroad companies of this state were incorporated under special charters; and proposed leases of their properties and franchises were submitted to the legislature for its approval. The confirmation by that body of the lease of the Morris and Essex Railroad Company on February 9th, 1869 (*Pamph. L., p.* 28), and of the lease by the United New Jersey Railroad and Canal Company to the Pennsylvania Railroad Company on March 27th, 1873 (*Pamph. L., p.* 1298), are examples of such legislative action.

On April 2d, 1873, the legislature passed what is commonly known as the General Railroad law (*Rev., p.* 925), and since the enactment of that statute all railroad companies which have come into existence in this state have been incorporated thereunder. By the seventeenth section of that act all companies so incorporated were authorized to lease their roads to any other corporation or corporations of this or any other state; and by the supplement to the act passed March 11th, 1880, the section was amended so as to extend the power of leasing to corporations created by special charter, as well as those incorporated under the General Railroad law. *Sup. Rev., p.* 828. But neither in the original act, nor in the supplement, did the legislature restrict this power by the imposition of any conditions or limitations, nor provide any course of procedure to be followed by the companies seeking to avail themselves of the privilege thus granted, apparently leaving the whole matter of the term of

the lease, the rent to be reserved, and the mutual conditions and covenants thereof, as well as the procedure with relation thereto, to be determined solely by the boards of directors of the contracting companies.

Between March 11th, 1880, and April 14th, 1903, other statutes were enacted regulating the power of one railroad company to lease its property and franchises to another, but all of them were afterward repealed, except so far as they are embodied in "An act concerning railroads (*Rev.* 1903)," approved on the latter date. *Comp. Stat.,* p. 4219. The sixty-fourth section of that revision, after practically re-enacting the provisions of section 17 of the General Railroad law of 1873, as amended in 1880, contains the following limitation upon the power conferred, viz., "No such lease shall take effect until the parties thereto file in the office of the secretary of state an agreement surrendering to the state all rights of exemption and contract privileges with respect to taxation, and reserving to the state any existing right to take the property of any of the parties." A second limitation is contained in the sixty-fifth section of the act, to wit, that every lease "shall be made by a contract approved, either in writing or by a vote at a meeting of stockholders, by the holders of two-thirds of all the capital stock of the railroad company of this state, party to such contract, and filed with the secretary of state."

After the enactment of the revision of 1903, the power of railroad companies to lease their property and franchises was left untouched by the legislature until the passage of the Public Utilities act of 1911. From the above recital it appears that at the time of the passage of this act the only limitations which were placed upon the untrammeled power to lease their roads, conferred on railroad companies of this state by the act of 1873 and its supplement of 1880, were the requirements contained in sections 64 and 65 of the revised act concerning railroads of 1903, which have already been set out in full; and that the evidence of compliance with those requirements is provided for in the sections themselves, namely, by the filing in the office of the secretary of

state, in the one case, the agreement surrendering tax exemptions and privileges, and the reservation of the state's right to take the property of any of the parties to the lease, if such right exists; and, in the other case, the approval of the 'lease by the holders of two-thirds of the stock of the domestic corporation. It seems hardly necessary to point out that, as an observance of these requirements is necessary to give life to the lease, an approval of the instrument by the board of public utility commissioners in the absence of such observance would be absolutely nugatory; and that an approval by it which was a mere declaration that these two requirements had been observed, would be of no benefit either to the parties to the lease or to the public at large, for, as to the parties, they would already know it, and, as to the public, the legislature had already provided a means of knowledge—that is, by inquiry at the office of the secretary of state.

It seems clear from a consideration of the statutory history of the power of a railroad company to lease its road, that when the legislature in 1911 declared that no such company should exercise that power without the proposed lease should be "approved" by the board of public utility commissioners, it intended something more than that the board should make inquiry at the secretary of state's office to ascertain whether the restrictions of sections 64 and 65 of the revised act concerning railroads had been complied with. The question then is what was the legislative intent; and the answer seems to us to be plain. The legislature, by the enactment of the provision of section 65 of the revised act concerning railroads, requiring that a proposed lease must be *approved* by the holders of at least two-thirds of the capital stock of the railroad company of this state a party to it, declared that thereafter the provisions of such lease— the term during which it should run, the rent to be reserved, and the mutual conditions and covenants to be contained therein—should not be left to be determined solely by the board of directors of such company, uncontrolled and unsupervised, but should be submitted to the consideration of

the stockholders for their determination as to the wisdom and propriety of such action; for their judgment on the question whether the provisions of the proposed instrument were beneficial to their interests, or otherwise.   When, in 1911, the legislature required a railroad company proposing to lease its road to submit the instrument to the board of public utility commissioners for its approval, it designedly had recourse to the same word which it had used in section 65 of the revised act concerning railroads, and thereby provided a double "approval," first, by the stockholders, and then by the board, as a prerequisite to the making of the proposed lease by the directors; the approval of the stockholders being required so that a lease should not be made which, in their judgment, contained provisions inimical to their interests, or omitted provisions which their interests required to be contained therein, and that of the board for the purpose of preventing a lease from being made which, in its judgment, embraced provisions which would be inimical to the interests of the state and its citizens, or which omitted provisions which were requisite for the protection of those interests.

But, it is said, to so construe the act is to make it repugnant to the constitution, in that it delegates to the board a power which can only be exercised by the legislature itself. If this be the fact then the whole case of the appellant falls. If the power to determine what provisions such a lease as that which was before the board shall contain, and what it shall not contain, is a legislative power which cannot be delegated, then it is manifest that no valid lease can be made under our existing statutes.   As we have already pointed out, by the act of 1873 the legislature delegated to the boards of directors of the contracting companies full power to determine what provisions a proposed lease should contain and what it should not contain, without restriction or limitation.   That power still subsists, subject to the restrictions already discussed which have been placed upon it.   If the legislature cannot delegate to a public utility board the power to pass upon the propriety of the provisions of a proposed

lease because of constitutional inhibitions, it necessarily follows that for the same reason it cannot confer upon boards of directors, or stockholders of a public utility corporation, a power which is identical in its essence. *Intermountain Rate Cases*, 234 *U. S.* 476.

It is hardly necessary to add that in the absence of legislative authority conferred for that purpose, a lease made by a railroad corporation of its road and franchises would be absolutely null and void. *Black* v. *Delaware and Raritan Canal Co.*, 24 *N. J. L.* 455; *Stewart* v. *Lehigh Valley Railroad Co.*, 38 *N. J. L.* 505; *Stockton* v. *Central Railroad Co. of New Jersey*, 50 *N. J. Eq.* 52.

But we do not consider the delegation of this power to be a violation of constitutional provisions. It is one of many conferred upon the board by the act of 1911. By that statute, in addition to the general supervision and control over and regulation of public utilities, so far as necessary for the purpose of carrying out the provisions thereof, the legislature vested in the board, among other specific powers, the following: to fix the rates to be charged by all of this class of corporations; to compel railroad and street railroad companies to establish and maintain connections at junction points for the promotion of the convenience of shippers and passengers; to compel such of said companies as are engaged in carrying merchandise to construct and operate, upon reasonable terms, switch connections with private side tracks, when such connections are reasonable and practicable; to require such companies to furnish safe, adequate and proper service, and to construct, maintain and operate extensions of their existing facilities where, in the judgment of the board, such extensions may be reasonable and practicable, and will furnish sufficient business to justify the construction and maintenance of the same; to permit street railway companies to change existing gauges to standard steam railroad gauge upon such terms and conditions as it shall prescribe; to authorize, or refuse to authorize, the issue of stocks, bonds or other evidences of debt payable in more than a year from the date thereof; to approve, or disapprove, the abandon-

ment by a railroad company of any of its stations; to grant to, or withhold from, such companies permission to cross highways at grade; and to compel the establishment and maintenance of gates by such companies at highway crossings when conditions are such as to require this to be done for the protection of the traveling public.

All of these powers, although widely variant as to the matters to be affected, and the purposes to be accomplished, by their exercises, are similar in character, so far as the right to delegate them is concerned. That the legislature may itself directly exercise each and every of them, is of course, unquestionable, but it does not follow, therefore, that they cannot be delegated. The contrary is the fact. As early as 1825 it was declared by Chief Justice Marshall, in *Wayman* v. *Southard,* 10 *Wheat.* 43, that congress certainly may delegate to others powers which it may rightfully exercise itself, and, so far as we are able to discover, the soundness of this proposition has never since been doubted. The distinction is accurately stated by the Supreme Court of Pennsylvania in *Locke's Appeal, 72 Pa. St.* 498, as follows: "The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact, or state of things, upon which the law makes, or intends to make, its own action depend." The powers conferred by the Public Utilities act of 1911 are, in our judgment, of this latter class. They are similar in their nature to those with which congress has invested the interstate commerce commission; and it is because those powers were of the delegable character specified in the Pennsylvania case that the United States Supreme Court has, in a long line of cases (many of which are cited in the Intermountain Rate cases), held that the legislative action there involved was free from the charge of unconstitutionality. Our own earlier decisions, as well as those of the Supreme Court, on questions involving action by the board of public utilities commissioners in the exercise of powers conferred upon it by the act of 1911, inferentially held the same view; for,

unless those powers were properly delegated to the board, the determination of questions involving their proper exercise was merely academic.

It is · further argued on behalf of the appellant that a construction of this statute which would confer upon the board of public utilities commissioners any discretion in acting upon a railroad lease submitted to it for its approval, would bring it into conflict with the constitutional prohibition against passing special acts conferring corporate powers. We are unable to appreciate the force of this contention. The law which empowers a railroad corporation of this state to lease its road is a general one, applicable to all such corporations no matter how created. The condition, or restriction, imposed by the Public Utilities act upon the exercise of this power by these companies is equally general, binding upon every railroad company of the state, and applicable to every lease proposed to be made by any such company.

The question remains as to the supervisory power of the Supreme Court over the action of the board in granting or withholding its approval of a lease proposed to be made by a railroad company of this state of its railroad and franchises. That court can upon *certiorari,* or under the statutory procedure provided by section 38 of the act of 1911, review such action for the purpose of ascertaining whether or not it is purely arbitrary, whether or not it has a reasonable basis to rest upon, whether or not it is supported to any extent by the facts submitted to the board for its consideration; and if it shall be made to appear to the court that such action is purely arbitrary, or that it has no reasonable basis upon which to rest, or is unsupported by the facts laid before the board, the court may declare it null and void, and order it to be set aside. So, too, if the board refuses to consider the matter at all the court by *mandamus* can compel it to do so. But as the matter of granting or withholding its approval is one which is left by the legislature to the sound discretion of the board, the Supreme Court cannot substitute its own judgment for that of this legislative agent, and compel it to act upon the application for its approval in a specific

87 N. J. L.    Commercial Trust Co. v. Hudson Co. Tax Bd.

way. *High Extr. Leg. Rem.*, § 34; *Benedict* v. *Howell*, 39 *N. J. L.* 221; *Shumar* v. *Applegate*, 51 *Id.* 117; *Conger* v. *Freeholders of Middlesex*, 55 *Id.* 112. In dealing with such agencies the court is controlled by the same principles that govern it with relation to the exercise of its supervision over inferior judicial tribunals, *i. e.*, it will compel them to proceed to judgment, but will never direct the character of the judgments to be rendered by them. *Wells* v. *Stackhouse*, 17 *Id.* 355; *Sinnickson* v. *Corwine*, 26 *Id.* 311; *Drake* v. *Camp*, 45 *Id.* 293.

The judgment under review will be affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, SWAYZE, PARKER, BERGEN, KALISCH, BLACK, VREDENBURGH, WHITE, WILLIAMS, JJ.    10.

*For reversal*—None.