THE PENNSYLVANIA RAILROAD COMPANY, A CORPORA-
TION, APPELLANT, v. DEPARTMENT OF PUBLIC UTILI-
TIES, BOARD OF PUBLIC UTILITY COMMISSIONERS,
STATE OF NEW JERSEY, RESPONDENT.

BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINE-
MEN, BROTHERHOOD OF RAILROAD TRAINMEN,
ORDER OF RAILWAY CONDUCTORS AND BROTHER-
HOOD OF LOCOMOTIVE ENGINEERS, ADDITIONAL AP-
PELLANTS.

Argued December 7, 1953—Decided February 1, 1954.

412

414

Mr. *Raymond J. Lamb* argued the cause for the appellant (*Messrs. Emory, Langan & Lamb,* attorneys; *Mr. A. S. Schroeder* of the Pennsylvania bar, of counsel; *Messrs. Charles W. Hutchinson* and *Samuel Lyon,* on the brief).

Mr. *John E. Toolan* argued the cause for the additional appellants (*Messrs. Toolan, Haney & Romond,* attorneys).

Mr. *John R. Sailer*, Deputy Attorney-General, argued the cause for the respondent (*Mr. Theodore D. Parsons*, Attorney-General, and *Mr. Frank H. Sommer*, attorneys).

The opinion of the court was delivered by

JACOBS, J. This is an appeal from an order of the Board of Public Utility Commissioners dated April 28, 1953; it has been certified to this court pursuant to *R. R.* 1:10. See 13 *N. J.* 430 (1953).

On the evening of February 6, 1951 there was a disastrous wreck on the Perth Amboy and Woodbridge branch of the Pennsylvania Railroad. Eighty-four lives were lost and approximately 860 persons were injured. Thereafter investigations were made by the Board of Public Utility Commissioners and the Attorney-General. During its investigation the board conducted many hearings, which were participated in by representatives of the Pennsylvania, and in due course issued its *Findings, Recommendations and Order* (Docket No. 5473). On April 19, 1951 the Attorney-General issued his *Report*. These indicated that the train derailed as it moved onto a temporary runaround track located near the Woodbridge station and put in use for the first time on February 6th. The track was considered safe for a restricted speed and the Pennsylvania had issued its General Order No. 1806 which provided that "Trains and engines must not exceed a speed of 25 miles per hour" at the designated location. Apparently this order had been posted on the Pennsylvania's bulletin boards in accordance with its operating rules and copies had been furnished to the train's engineman, fireman and conductor. However, there were no additional objective precautions designed to insure awareness and observance of the speed restriction. The automatic block signals were not used to indicate the restricted speed and no appropriate slow boards or speed markers were placed along the trackage. In the board's language: "Entire dependence for complying with the speed restriction and for operating trains at reduced speed over the runaround at Woodbridge was placed in the General Order and on the retentiveness of

the memory of the engineman." In its specific findings the board stated that the engineman had failed to reduce the speed of the train to 25 miles an hour when approaching the runaround track; that the accident was caused by excessive speed of the train; and that there was a lack of uniformity in the railroad rules and practices relating to signals or slow boards indicating restricted speed areas. In its recommendations and order the board suggested that the Pennsylvania exercise closer supervision over the distribution of general orders and give consideration generally (1) to the use of markers and automatic block signals to indicate temporary speed restrictions, (2) the use of permanent speed restriction signs, and (3) the installation of an automatic train and speed control system. The Attorney-General's *Report* also concluded with recommendations and suggested the creation of a commission to study proposed signals and speed restrictions, requirements for examination of train personnel, operation, construction, maintenance and equipment and related matters.

Under date of July 13, 1951 the board addressed letters to the Pennsylvania and the other railroads operating in New Jersey which called a conference for the purpose of ascertaining (1) the adequacy of the physical examinations of enginemen and trainmen; (2) methods of obtaining closer supervision of the distribution of general orders, and (3) methods of bringing about greater uniformity in railroad practices, particularly those relating to the use of cautionary signals, markers and slow boards. The conference was held and ultimately the railroads, including the Pennsylvania, agreed to the following minimum practices: (1) physical examinations of train and engine road service employees not less than every two years; (2) employees in train and engine road service reporting sick to be re-examined if off for more than 30 days; (3) engineers and conductors to receipt for and carry copies of general orders; and (4) temporary slow order practice to provide for a signal at a proper distance in advance of the point of restriction, a second signal at the point of restriction, and a third signal

indicating the end of the restricted territory. A letter confirming this agreement was sent by the railroads' representative to the board under date of September 12, 1951 and a further letter dated September 15, 1951 was sent directly by the Pennsylvania to the board.

Not being satisfied with the extent of the measures being voluntarily undertaken by the Pennsylvania and the other railroads, the board on November 7, 1951 issued orders to show cause in similar form and addressed individually to each of them. The order to the Pennsylvania (Docket No. 5847) directed it to appear before the board on December 12, 1951 and show cause why it should not be required to: (1) establish as minimum practice, physical examination of enginemen in road service at intervals of three months and of firemen in road service at intervals of six months; (2) adopt a rule requiring conductors, trainmen, enginemen and firemen in road service, upon resuming duties after an absence of 15 days or more, to be examined with respect to their knowledge of changes which have occurred in operating rules, time table instructions, or general orders, during their absence; (3) adopt a rule requiring enginemen and firemen in road service upon resuming duties after an absence of three months to be examined as to their knowledge of the physical characteristics of the road over which they will operate; (4) adopt the practice of controlling the automatic block signals to indicate temporary speed restrictions; (5) adopt the practice of installing markers or signs in advance of track affected by permanent speed restrictions; (6) adopt a rule requiring supervisory employees to verify that road service enginemen and conductors are in possession of and have read the general orders, and (7) subject motive power and other rolling stock to more comprehensive and intensive inspection. The hearing was held on December 12, 1951 and was continued on December 13 and 19. No witnesses were called by the board but five witnesses called by the Pennsylvania were duly examined. They included its chief medical examiner, general superintendent of transportation, general superintendent of telegraph, general superintendent

of motor power of the eastern region and assistant mechanical engineer. In addition the Brotherhood of Locomotive Firemen and Enginemen introduced testimony by one of its representatives and by a member of the staff of the Board of Public Utility Commissioners.

The chief medical examiner testified with respect to proposal (1) relating to the physical examination of enginemen and firemen. All employees are subject to pre-employment examination; employees in the engine service are examined every two years before the age of 40 and every year thereafter; firemen are examined before promotion to enginemen and, if furloughed for more than 30 days, undergo further examination before being permitted to return to duty. In response to an inquiry as to why there was more frequent examination after 40 he said: "It is at the age of forty when the degenerative processes begin to set in, and we think that then we should be on the lookout, at least at yearly intervals, to see what is going on in the individual." He acknowledged that many industries now require periodic medical examinations of employees but stated that he knew of none where they were required at three month intervals. The most stringent he had heard of was a six-months' periodic examination of airplane pilots. He expressed the view that there was no need for more frequent examinations of engineers and firemen than those presently being given by the Pennsylvania. He did not testify as to practices on other railroads; in fact, their periodic examinations of enginemen and firemen vary considerably. One railroad examines its enginemen and firemen annually and most of the others examine enginemen annually and firemen biannually, or both classes biannually, with more frequent examinations for the older employees.

The superintendent of transportation testified with respect to proposal (2) relating to examination on changes in general orders after 15 days' absence, and proposal (3) relating to examination on physical characteristics of the road after three months' absence. He expressed the view that neither proposal would add to the safety or increase the efficiency of the

railroad's operations. Pennsylvania's practice is to place general orders on bulletin boards which enginemen and conductors are required to examine when reporting to work. Enginemen instruct their firemen and conductors instruct their trainmen regarding the orders. Men report for work at various points of each of the three divisions of the railroad and there would be considerable expense and inconvenience if, after being absent for 15 days because of vacation or otherwise, they were required to be examined on general orders before one of the qualified rules examiners employed by the railroad. Under Pennsylvania's practice a man must familiarize himself with the physical characteristics of the road before he qualifies as engineman and to keep qualified he must make a trip over the territory once a year. The superintendent's testimony recognized the need for examination on physical characteristics after extended absence but asserted that Pennsylvania's present requirements were sufficient; he did not "think a period less than a year would be necessary." He did not testify as to the practices of other railroads. In fact, one railroad requires enginemen and conductors, absent for 15 days or more, to submit their rules binders for examination to insure that they contain all general orders then in effect; and several others require engineers and conductors in road service, absent for 30 days or more, to be examined by a trainmaster or road foreman with respect to their knowledge of changes in operating rules. Similarly, one railroad requires engineers in road passenger service, absent for 90 days or more, to make a qualifying run under the supervision of a road foreman; another requires a qualifying run after an absence of 120 days and several others require it after an absence of six months.

The general superintendent of transportation testified with respect to proposal (4) relating to the use of the automatic block signals to indicate temporary speed restrictions and proposal (5) relating to the installation of markers or signs to indicate permanent speed restrictions. The Pennsylvania does not manipulate automatic block signals to control speed

and does not maintain permanent speed restriction markers; its witness expressed the view that its present practices are adequate and need not be altered. Practically every mile of Pennsylvania's system is equipped with some form of block signal. The lighter trafficked portions of the railroad are covered by manual block signals, the more densely trafficked portions are covered by automatic block signals, and on the most densely trafficked portions automatic block signals are supplemented by cab signals. The automatic block signals have been used to convey information on the occupancy of track in advance of the train and the witness suggested that their manual manipulation to indicate temporary speed restrictions would impair the integrity of the system in the minds of the enginemen. The representative of the Brotherhood testified in support of this view.

Although markers or signs indicating permanent speed restrictions as contemplated by proposal (5) are used to a certain extent by other railroads, the Pennsylvania does not use them and its witness testified that he considered its practice to be "quite safe." As he put it, "I feel we can quite safely depend on the engineman for his knowledge of the physical characteristics and his knowledge of all of the speed restrictions." He referred to the difficulties in attempting to define the expression "permanent speed restrictions" since oftentimes there are different restrictions in force on the same track at the same time. The Brotherhood's representative expressed the view that proposal (5) "would not contribute to and could possibly detract from safety of operation"; he acknowledged that some of the railroads use markers designating permanent speed restrictions but he doubted their value. He cautioned that the engineman's knowledge of his timetable and the physical characteristics of his run should not be underestimated since "he knows the road like he knows the palm of his hand and takes great pride in a thorough familiarity with the contents of the timetable." Pennsylvania's witness testified that its accident record was improving although there had been a recession "in the past eighteen months." In response to an inquiry he stated that

he had no suggestions as to how the railroad's methods of operation could be improved to reduce accidents. Proposals (6) and (7) were the subject of additional testimony which need not be discussed; the board dismissed these proposals and they are not the subject matter of Pennsylvania's appeal.

On April 28, 1953 the board issued its decision and order which reviewed the testimony in detail and embodied its conclusions and directions. Although they were never formally made part of the record the board stated that it had taken official notice of the Attorney-General's *Report,* the board's *Findings, Recommendations and Order* in Docket No. 5473 and the practices of other railroads operating in the State of New Jersey. With respect to proposal (1) it concluded that examinations of three and six months for enginemen and firemen respectively would not at the present time be reasonable, but that it would be reasonable to require as minimum practice the physical examination of enginemen and firemen in road service at least once a year, and more often at the discretion of the medical examiner of the railroad when any significant abnormality is found in an employee. Paragraph I of its order embodies a provision to that effect. With respect to proposal (2) it rejected the testimony that examination after 15 days' absence would constitute an unreasonable burden and concluded that requirement therefor "would be in the public interest by insuring that enginemen and conductors at all times have the full knowledge and understanding of rules and orders necessary to meet the responsibility imposed upon them" and "necessary to promote greater safety in the operation of the railroad." Paragraph II of its order embodies a requirement for such examination. Similarly, the board found that a requirement for the examination of enginemen and firemen on physical characteristics of the road after an absence of three months or more "would be in the public interest by insuring that such employees at all times have the full knowledge of and familiarity with the physical aspects and characteristics of the railroad necessary to meet the responsibility imposed upon them" and "necessary to promote greater

safety in the operation of the railroad." Paragraph III of its order embodies a requirement for such examination.

With respect to proposal (4) the board stated that its study of the testimony and its knowledge of the practices of other railroads did not permit it to agree with the views expressed on Pennsylvania's behalf but, on the contrary, lent support to the view that failure to utilize automatic block signals to aid in obtaining compliance with temporary speed restrictions "is tantamount to a failure to take advantage of the full potentialities for safety of automatic block signals, generally recognized as the most effective means yet devised for safeguarding and controlling the movement of trains." It considered invalid the suggestion that manual manipulation of the automatic block signals would impair the integrity of the system and concluded that "a requirement to utilize automatic block signals to control movement of a train approaching a segment of track affected by a temporary speed restriction would promote safety and would be an effective supplement to train orders, general orders and 'slow boards' covering such speed restrictions." Paragraph IV of its order embodies such requirement.

With respect to proposal (5) the board stated that the suggested difficulties did not appear to be insurmountable and that markers or signs indicating permanent speed restrictions would be of value "and should be installed, except within limits of interlocking plants, on all single and double track line and wherever practicable and feasible on sections of the railroad having three or more tracks." Paragraph V of the board's order embodies such requirement. Proposals (6) and (7) were dismissed but the board embodied in paragraphs VI, VII and VIII of its order, directions that the Pennsylvania adopt and adhere to the several requirements which had been agreed upon by the Pennsylvania and the other railroads after informal conference. The appeal by the Pennsylvania is from all of the directions and requirements embodied in the board's order. The show cause proceedings against the other railroads resulted in similar orders which are the subject matter of the appeal in a companion

case. See *The Lehigh and Hudson River Railway Company, et als. v. Department of Public Utilities*, 14 *N. J.* 440 (1954).

▮ There is no doubt that our Legislature has ample constitutional power to impose reasonable safety requirements on railroads operating in New Jersey, provided there is no substantial interference with interstate commerce or intrusion onto a field which Congress has occupied completely. See *Lakewood Express Service v. Board of Public Utility Com'rs.*, 1 *N. J.* 45, 49 (1948); *California v. Thompson*, 313 *U. S.* 109, 113, 61 *S. Ct.* 930, 85 *L. Ed.* 1219, 1221 (1941); *Southern Pacific Co. v. State of Arizona*, 325 *U. S.* 761, 767, 65 *S. Ct.* 1515, 89 *L. Ed.* 1915, 1923 (1945); *Napier v. Atlantic Coast Line R. Co.*, 272 *U. S.* 605, 47 *S. Ct.* 207, 71 *L. Ed.* 432 (1926). The utility act (*Revised Statutes, Title* 48) contains many such provisions, and after the Woodbridge wreck it was supplemented by a specific requirement for the installation of cautionary boards indicating runaround or temporary tracks. *L.* 1952, *c.* 213; *N. J. S. A.* 48:12–40.1. However, the exigencies of government preclude direct and detailed legislative supervision of the daily operations of the railroads within the State and it has been rightly delegated to the Board of Public Utility Commissioners with broad statutory powers to be exercised in accordance with general standards. *West Jersey & Seashore Railroad Company v. Board of Public Utility Commissioners*, 87 *N. J. L.* 170 (*E. & A.* 1915); *Ward v. Scott*, 11 *N. J.* 117, 123 (1952). Thus, *R. S.* 48:2–23 provides that the board may, after notice and hearing, require any public utility to furnish safe, adequate and proper service; and *R. S.* 48:2–25 provides that it may, after hearing, fix just and reasonable standards, classifications, regulations and practices to be followed by any public utility. See also *R. S.* 48:2–13; *R. S.* 48:3–3. We find no merit to the appellants' point that *R. S.* 48:2–25 should be restricted to the regulation of public utilities engaged in the sale of electricity, gas, water or other substances which are measured by meters. Nothing in its express terms or apparent purposes so limits it and we are persuaded that its comprehensive language should be

given its ordinary meaning. The cited statutory provisions are wholly adequate to support the board's jurisdiction to order railroads to adopt practices which are found to be justly and reasonably necessary to afford safe transportation to the public.

The board's function in prescribing such safety practices is legislative in nature (or *quasi*-legislative). *Cf. Abbotts Dairies v. Armstrong*, 14 *N. J.* 319 (1954) ; *Prentis v. Atlantic Coast Line Co.*, 211 *U. S.* 210, 226, 29 *S. Ct.* 67, 53 *L. Ed.* 150, 158 (1908). The pertinent requirements for advance notice and hearing are statutory rather than constitutional. *State Board of Milk Control v. Newark Milk Co.*, 118 *N. J. Eq.* 504, 522 (*E. & A.* 1935) ; *Pacific States Box & Basket Co. v. White*, 296 *U. S.* 176, 56 *S. Ct.* 159, 80 *L. Ed.* 138 (1935). *Cf. Adams Theatre Co. v. Keenan*, 12 *N. J.* 267, 278 (1953). Fortunately there is a strong legislative trend in favor of prior hearing, as prescribed in *R. S.* 48:2–23 and *R. S.* 48:2–25, even where the function may properly be considered legislative rather than judicial in nature. Compare *Abbotts Dairies v. Armstrong, supra,* with *State Board of Milk Control v. Newark Milk Co., supra.* See *Report on the State Administrative Agency in New Jersey* (1938). Such hearing need not conform strictly with common law rules of evidence or procedure. See *Abbotts Dairies v. Armstrong, supra. Cf. Norwegian Nitrogen Products Co. v. United States*, 288 *U. S.* 294, 53 *S. Ct.* 350, 77 *L. Ed.* 796 (1933). Although the appellants urge that the statutory hearing is judicial in nature (or *quasi*-judicial), its precise designation is unimportant. See *Central Home Trust Co. v. Gough*, 5 *N. J. Super.* 295, 299 (*App. Div.* 1949) ; *Davis, Administrative Law*, 255 (1951). Whatever be its label it is not a formality which may be disregarded but is a substantial protective device prescribed by the Legislature to afford the interested parties fair opportunity to be heard and refute such evidence or material as the board may rely upon to support its action. See *Abbotts Dairies v. Armstrong, supra; In re Plainfield-Union Water Co.*, 11 *N. J.* 382 (1953), *Id.* 14 *N. J.* 296 (1954).

In the course of the hearing the board must be given full latitude to avail itself of the wealth of general information and expert knowledge which it obtains in the performance of its day-to-day administrative activities. *Cf. Elizabeth v. Board of Public Utility Com'rs.*, 99 *N. J. L.* 496, 497 (*E. & A.* 1924); *In re Port Murray Dairy Co.*, 6 *N. J. Super.* 285, 296 (*App. Div.* 1950). By taking appropriate official notice, making it part of the hearing record, and affording fair opportunity of refutation, the board may adequately protect both the public and private interests concerned. See *Krauss v. A. & M. Karagheusian*, 13 *N. J.* 447, 461 (1953); *Davis, Official Notice*, 62 *Harv. L. Rev.* 537 (1949). Similarly, official reports and transcripts in other proceedings before the board may readily be made part of the hearing. *Cf. United States v. Abilene & Southern Railway Company*, 265 *U. S.* 274, 44 *S. Ct.* 565, 68 *L. Ed.* 1016 (1924). In this fashion the board may stay within the record and rest thereon its order accompanied by adequate findings which determine the basic facts and the conclusions therefrom. In recent years this court has been called upon frequently to point out that such findings are of the utmost importance not only in insuring a responsible and just determination by the board but also in according a proper basis for the judicial review which is expressly afforded by statute and rules. *R. S.* 48:2–43; *R. R.* 4:88–8. See *Central R. Co. of N. J. v. Dep't. of Public Utilities*, 7 *N. J.* 247, 261 (1951), *Id.* 10 *N. J.* 255 (1952). *Cf. Abbotts Dairies, Inc. v. Armstrong, supra; Household Finance Corp. v. Gaffney*, 11 *N. J.* 576 (1953); *Delaware L. & W. R. Co. v. City of Hoboken*, 10 *N. J.* 418 (1952); *New Jersey Bell Telephone Co. v. Communications Workers, etc.*, 5 *N. J.* 354 (1950); *Pennsylvania R. R. Co. v. N. J. State Aviation Comm.*, 2 *N. J.* 64 (1949); *Davis, Administrative Law*, 521, 526 (1951).

Although the foregoing principles are now generally understood and accepted, they are not to be applied to particular administrative proceedings where good sense and justice dictate otherwise. See *Market Street R. Co. v. Railroad*

*Comm. of Cal.*, 324 *U. S.* 548, 65 *S. Ct.* 770, 89 *L. Ed.* 1171 (1945); *United States v. Pierce Auto Freight Lines*, 327 *U. S.* 515, 66 *S. Ct.* 687, 90 *L. Ed.* 821 (1946); 18 *A. L. R. 2d* 579 (1951). In the *Market Street* case the court declined, in the absence of a showing of prejudice, to upset an order of a state utility commission though the commission went beyond the strict record in making certain predictive findings. And in the *Pierce Auto Freight* case the court declined, in the absence of a showing of prejudice, to upset an order of the Interstate Commerce Commission though it had considered the evidence in related proceedings. In the course of his opinion for the court, Justice Rutledge aptly said (327 *U. S.*, at *page* 529, 66 *S. Ct.*, at *page* 689, 90 *L. Ed.*, at *page* 832):

> "It is true that ordinarily an administrative agency will act appropriately, in a proceeding of this sort, upon the record presented and such matters as properly may receive its attention through 'official notice.' It is also true that this Court, in appropriate instances, has limited the use of the latter implement in order to assure that the parties will not be deprived of a fair hearing. See *United States v. Abilene & S. R. Co.*, 265 *U. S.* 274, 286-290, 44 *S. Ct.* 565, 568-570, 68 *L. Ed.* 1016, [1021-1024]; *Interstate Commerce Commission v. Louisville & N. R. Co.*, 33 *S. Ct.* 185, 227 *U. S.* 88, 93, 94, 187, 188, 57 *L. Ed.* 431 [434]. But in doing so it has not undertaken to make a fetish of sticking squarely within the four corners of the specific record in administrative proceedings or of pinning down such agencies, with reference to fact determinations, even more rigidly than the courts in strictly judicial proceedings. On the contrary, in the one case as in the other, the mere fact that the determining body has looked beyond the record proper does not invalidate its action unless substantial prejudice is shown to result. *Market Street R. Co. v. Railroad Commission*, 324 *U. S.* 548, 561, 562, 65 *S. Ct.* 770, 777, 778 [89 *L. Ed.* 1171, 1181, 1182]; *cf. Opp Cotton Mills v. Administrator* [of Wage & Hour Division], 312 *U. S.* 126, 154, 155, 657, 61 *S. Ct.* 524, 536, 537, 85 *L. Ed.* 624 [640, 641]. In these cases no more is necessary than to apply that rule."

█ The Pennsylvania attacks the board's action in taking official notice of the Attorney-General's *Report*, the *Findings, Recommendations and Order* in Docket No. 5473, and the practices of other railroads as evidenced during the proceedings on the independent though contemporaneous show

cause orders issued to them. We agree that in due time during the course of the hearing the board should have formally advised the Pennsylvania that these matters were being officially noticed and made part of the hearing record. However, we fail to see how the Pennsylvania was in anywise prejudiced by the omission. It was fully aware of the circumstances surrounding the Woodbridge wreck, the ensuing investigations, reports and conferences which culminated in the show cause orders, and the proceedings thereon including the evidence relating to the practices of the railroads bearing on each of the specific subjects under consideration. In the course of the hearing, references were made to the Woodbridge wreck and the resulting investigations, specific inquiry was made as to whether there were any suggestions for attaining a higher measure of safety, and full opportunity was given for the introduction of oral testimony and documentary evidence. At the close of the hearing there were no motions addressed to the manner in which it had been conducted, although at one point Pennsylvania's counsel suggested that he would like to make a motion which he later waived. After the board's decision was rendered there was no attack before it, by petition for rehearing which was admittedly available, on the accuracy of the evidence upon which it relied. It is not suggested that if the related proceedings had formally been made part of the hearing record further testimony would have been introduced; and there is no dispute in this court as to the material facts which have been outlined earlier in this opinion and upon which the validity of the board's order will be tested. Under the particular circumstances it would be neither realistic nor just to upset the entire proceeding before the board on the narrow ground that it improperly took official notice of the other related proceedings in which the Pennsylvania had, in considerable measure, participated. Cf. *United States v. Pierce Auto Freight Lines, supra*:

"In the absence of any showing of specific prejudice, the claim comes down to the highly technical objection that the Commission, in the final stage of forming its judgment, could not in either case

take account of what had been done in the other, notwithstanding the closely related character and objects of the applications and the prior proceedings. The contention in its farthest reach amounts to a legal version of the scriptural injunction against letting one's right hand know what one's left hand may be doing.

Obviously it would be consistent neither with good sense nor, we think, with the type of hearing assured by the statute to force the Commission to put on such complete blinders."

 The Pennsylvania contends that none of the requirements imposed by the board finds support in the evidence and that consequently its entire order should be vacated. The provisions in the board's order will be considered *seriatum*. Paragraph I requires the physical examination of enginemen and firemen in road service at least once a year. On its face it appears wholly reasonable and in accord with recommendations of the medical profession made with respect to occupations involving much lesser hazard and responsibility for the safety of others. *Wampler, Industrial Medicine*, 145 (1943) ; *Shillito, Periodic Health Examinations*, 39 *Annals of Internal Medicine*, 13 (*July* 1953). We gather that Pennsylvania's objection to the moderate extension of its present annual examinations is not grounded primarily on increased expense or inconvenience but on its position that the change was not shown to be necessary in the interests of safety and should remain a matter of management's judgment rather than board directive. We consider this position to be untenable. The board has a high and continuing public responsibility to insure that railroads provide safe transportation. It need not, of course, await the happening of an accident before it acts to compel an additional safety measure which, after due evaluation of its benefits and burdens, it finds reasonably necessary for protection of the public. The value of annual physical examinations for enginemen and firemen in road service is self-evident and hardly requires any special affirmative proof; there was no showing that the burdens thereof on Pennsylvania could be deemed considerable. We find that the board's action was justified by the record and was well within its statutory authority.

 Paragraph II requires that conductors, trainmen, enginemen and firemen in road service, absent for 15 days or more, be examined to ascertain their knowledge of any changes in operating rules or general orders. The value of taking some steps to insure that road service personnel are aware of and understand rules changes is self-evident and requires no special affirmative proof. But the Pennsylvania contends that its present practices are sufficient and that examination by specially qualified rules examiners employed as such would cause undue expense and inconvenience. We find no occasion for disturbing the board's judgment that Pennsylvania's present practices should be improved but have not been shown any need for having the examination conducted by a specially qualified rules examiner employed as such. As has been indicated, several railroads now follow the practice of having enginemen and conductors in road service examined by a trainmaster or road foreman as to their knowledge and understanding of any changes in operating rules and general orders which have occurred during their absence. Similarly, the enginemen and conductors may readily make certain that the firemen and trainmen supervised by them are familiar with and understand the changes. It appears to us that the proper objectives of paragraph II may be accomplished, without entailing unnecessary inconvenience and expense, by modifying it to provide that enginemen, conductors, firemen and trainmen in road service, absent for 15 days or more, be examined by competent supervisory personnel designated by the railroad with respect to their knowledge and understanding of any changes in operating rules or general orders which have occurred during their absence.

 Paragraph III requires that enginemen and firemen in road service, absent for three months or more, be examined on the physical characteristics of the division over which they will operate. The need that some precautionary steps be taken where the engineman has not covered the territory for a considerable period of time seems beyond dispute. The board might well have fixed the period at six rather than

three months, although we shall not disturb its exercise of judgment in this regard. However, no need has been shown for having the examination conducted by specially qualified rules examiners employed as such; nor are we persuaded that the application of the requirement in paragraph III to firemen is reasonably necessary in the interests of safety. As represented to us at oral argument, the Pennsylvania fireman is always under the engineman's supervision and does not operate the train except to bring it to an immediate halt if, because of an emergency, the engineman is unable to continue. The fireman's responsibility is thus severely limited and his first run over territory which he has not traveled for any period of time is necessarily under another's guidance. Upon the showing before us we believe that paragraph III should be modified to exclude firemen from its coverage and to permit the examination to be conducted by competent supervisory personnel designated by the railroad.

Paragraph IV requires the Pennsylvania to "adhere to the practice of controlling automatic block signals on the approach to or in advance of track affected by temporary speed restrictions so that the best indication they can possibly display is 'Approach' when the restriction is equivalent to medium speed or less and when the restriction is imposed because of resort to use of temporary support of track, temporary change in alignment of track or other comparable conditions." Under the ordinary automatic block signal a "Clear Seat" signal means that the block immediately beyond that signal is clear and that the next block beyond that is clear. When the "Approach" signal appears it means that the next signal is "Stop and Proceed" and that in turn means that the track signal has been shunted either by a train or a broken rail or an improperly set switch. The "Stop and Proceed" signal means that the train must come to a halt at the signal and then proceed at no more than 15 miles per hour, the engineman being on the alert for the train ahead, the broken rail or the improperly set switch.

The Pennsylvania and most other railroads do not manipulate block signals to control speed and the testimony in the

record was strongly to the effect that such action might well impair rather than advance the interests of safety. The Pennsylvania's views were voiced by its General Superintendent of Telegraph whose two-fold objections have been summarized as follows:

"(1) If the engineman knows that the signal is set because there is a speed restriction he may improperly assume that the 'Approach' signal is not involved with the next signal so that when he passes over the slow order, if the block is long, he may increase his speed and approach the signal at too high a rate of speed. If he does so on the occasion that the next signal is in fact involved with the 'Approach' signal and shows a 'Stop and Proceed' signal he is not going to be able to stop his train in time to avoid a collision or a derailment; (2) The railroad considers the integrity of the signal system itself to be of paramount importance. It has taken Pennsylvania two or three generations to build up absolute confidence of engineers in their signal system and this faith will be lost by the manipulation of signals to give false indications."

The Brotherhood's representative testified that the practice of manual manipulation of automatic block signals to indicate speed restrictions was "pregnant with disaster" and that "far from promoting safety" it "would positively endanger it." In the companion proceeding involving the other railroads the overwhelming testimony was that the practice was fraught with danger and should be flatly rejected. No affirmative testimony supporting a contrary view was introduced on the board's behalf in either proceeding.

On the aforementioned limited showing we are unable to find that the requirement in paragraph IV was reasonably necessary in the interests of safety. It would seem that the board may, without in anywise impairing the integrity of the automatic block signals, largely achieve its objectives by requiring the maintenance of suitable markers, clearly observable to the engineman night and day, and adequately indicating temporary speed restrictions. To a considerable extent, *L.* 1952, *c.* 213, and the slow order practice which the railroads voluntarily agreed upon, achieve this result; any further steps in that direction which may reasonably be required may be compelled by the board after

appropriate proceedings under *R. S.* 48:2–23 and *R. S.* 48:2–25. In the meantime the provisions of paragraph IV must be set aside. In taking this action we do not suggest that the board may not in a later proceeding and upon an affirmative showing of reasonable necessity, prescribe some use of the automatic block signal system in aid of temporary speed restrictions. We are not convinced that there is merit to the Pennsylvania's contention that Congress has occupied the field of automatic block signals to the total exclusion of any state safety requirements bearing thereon. There may be temporary local problems which are wholly suitable to local safety regulations which may readily be imposed without impairing the effectiveness of the automatic block signal system or substantially burdening interstate commerce. We find nothing in the pertinent federal act (49 *U. S. C. A.* 26(*b*)) or the regulations thereunder which may properly be said to evidence Congressional intent to exclude state action under such limited circumstances.

Paragraph V requires the Pennsylvania "to install markers or signs at or on the approaches to track affected by permanent speed restrictions on single or double-track sections of the railroad, except within the limits of interlocking plants and, wherever feasible and practicable, on sections of railroad having three or more tracks, in addition to covering and listing such restrictions in the operating time-tables." We consider it evident without affirmative proof that where a permanent speed restriction marker will serve as a material aid to the memory of the engineman and will not in turn produce adverse consequences, it is an appropriate safeguard which may be considered by the board to be reasonably necessary in the interests of safety. At least one railroad now uses such markers very extensively and others use them wherever practicable and feasible. As has hereinbefore been indicated, Pennsylvania's witness objected because oftentimes there are several different speed restrictions in force on the same track at the same time; tracks are used for two-way operations in which the speed against the current of traffic is less than it is with the cur-

rent of traffic; different speed restrictions apply to different types of trains; and there are restrictions on turnouts, spring switches and interlocking switches. He testified that the Pennsylvania does not use permanent speed restriction markers; their installation would lead to confusion; and full reliance may be placed on the engineman's knowledge of physical characteristics and speed restriction. We have no hesitancy in sustaining the board's rejection of the view that complete reliance may be placed on the engineman's memory. But we are not satisfied that it has satisfactorily met the practical difficulties advanced by the Pennsylvania. The board may readily require the Pennsylvania to install, where practicable and feasible, permanent speed restriction markers which are visible to enginemen by day and night; if the board considers it necessary to go further in imposing a mandatory requirement it should reframe it with due regard for specific difficulties advanced by the Pennsylvania. Paragraph V is accordingly remanded for further hearing and disposition.

Paragraphs VI, VII and VIII embody the items which were voluntarily agreed upon by the Pennsylvania in advance of the board's order to show cause. They seem to be reasonable and well designed to advance the interests of safety. Thus, paragraph VI provides that train and engine road service employees when off duty for more than 30 days because of sickness or injuries shall be subjected to physical re-examination before resuming work; paragraph VII provides that enginemen and conductors in road service shall be required to carry with them when on duty copies of general orders in effect relating to train operation, their signature of receipt of such orders to constitute certification of their understanding of the orders; and paragraph VIII provides for temporary slow order practice including advance markers, markers at points of restriction and markers at termini of restrictions. The Pennsylvania has voluntarily complied with all of the foregoing. It contends, however, that it never had any notice that the board proposed to embody its voluntary agreement into an order. The board was

well within its jurisdiction in declining to rest upon the voluntary undertaking and in seeking to embody it in its Order. But the Pennsylvania was entitled to fair notice and hearing (*R. S.* 48:2–23; *R. S.* 48:2–25), with reasonable opportunity to show reasons, if any, why its voluntary agreement should not be incorporated into a binding order for the proper protection of the public. No such notice, hearing and opportunity were afforded to it and, accordingly, paragraphs VI, VII and VIII will be remanded for further proceedings.

We have considered the legal contentions advanced by the appellants and find them to be without merit; in the light of the observations and determinations made earlier in this opinion, the primary ones require but passing mention. It is urged that there was no evidence and finding that Pennsylvania's present practices and services are "inadequate, unsafe and improper" and that consequently there was no power in the board to enter its order. Where, as here, the evidence, including matters of common knowledge, and the express findings of the board support the determination that the provisions imposed by it and sustained by us are justly and reasonably necessary as minimum safety measures for the future, there is no need for further specific finding as to the inadequacy of past and present practices. Nor is there need for affirmative evidence or finding that omission of these measures has heretofore caused accidents; the board need not await the happening of such accidents but may act preventively upon proper findings which substantially indicate that the safety measures are reasonably necessary for the future protection of the public. The findings need not take any particular form so long as they fairly disclose, as they do in the instant matter, the basic facts upon which the board relies and its ultimate conclusions therefrom within the limits of the controlling statutory provisions and standards. See *Davis, Administrative Law*, 521 (1951).

The Pennsylvania's next contention, that it is being deprived of its property without due process of law, appears

to be entirely without foundation. It makes mention of the board's reference to matters outside the strict record, conduct which has been adequately discussed and has prejudiced no one. It asserts that it has been deprived of its right to manage its own property; presumably every state regulation of a public utility curbs management's right to operate as it pleases but, in view of the acknowledged breadth of the police power, it is far too late to assert its invalidity where, as here, it is found to be justly and reasonably necessary for the protection of the public health, safety or welfare. *State Board of Milk Control v. Newark Milk Co., supra; Pennsylvania-Reading Seashore Lines v. Board of Public Utility Commissioners*, 13 *N. J. Super.* 540, 545 (*App. Div.* 1951), affirmed 8 *N. J.* 85 (1951). It also asserts that the order is ambiguous and uncertain but we find no present supporting basis (*cf. In re Port Murray Dairy Co.*, 6 *N. J. Super.* 285, 300 (*App. Div.* 1950)) and point out that, in the event later circumstances warrant, application may readily be made to the board for such clarifications, modifications and exceptions as may be appropriate. *Cf. Railroad Commission of State of Wisconsin v. Chicago B. & Q. R. Co.*, 257 *U. S.* 563, 579, 42 *S. Ct.* 232, 66 *L. Ed.* 371, 379 (1922).

Finally, the Pennsylvania contends that the order violates the Commerce Clause of the Federal Constitution. We are satisfied that it does not. The requirements of the order, to the extent sustained, do not substantially impair the free flow of commerce between the states or intrude onto any field occupied completely by Congress. They are simply local safety measures which are reasonably designed to protect the traveling public within our State. Their advantages in guarding against accidents appear substantial and their disadvantages, measured in the asserted terms of expense and inconvenience, appear insubstantial. We consider that they fall well within the controlling decisions, listed by Justice Stone in *California v. Thompson, supra*, which have sustained many state safety regulations of comparable nature.

The order of the Board of Public Utility Commissioners is modified and the cause is remanded for further proceedings in accordance with this opinion.

HEHER, J. (dissenting in part). I would not exclude firemen from the coverage of paragraph III of the board's order, directing that enginemen and firemen in road service, after an absence of three months or more, be examined as to whether "they are qualified on the physical characteristics of the road over which they will operate."

This is a legislative inquiry peculiarly within the specialized and experienced judgment of the administrative authority; and where the agency keeps within its essential function, and there is not the arbitrary or unreasonable action that constitutes an excess of jurisdiction, there is no judicial revisory power. It is of the essence of the doctrine of separation of powers that the judiciary may not substitute its judgment on policy for that of the administrative agency. *In re Plainfield-Union Water Company*, 14 *N. J.* 296 (1954).

It is not decisive on this question that the fireman "is always under the engineman's supervision and does not operate the train except to bring it to an immediate halt if, because of an emergency, the engineman is unable to continue," and the fireman's responsibility is thus severely limited and his first run over territory which he has not travelled for any period of time is necessarily under another's guidance." I am aware of no reason related to the substance of the policy for this differentiation. The fireman has his own independent duties of giving crossing warning signals, observing and receiving signals, looking out for danger, and so on, and his duties and the engineman's in this regard are largely the same.

And I would not remand the cause for a hearing on notice as to the subject matter of paragraphs VI, VII and VIII, embodying the safety measures voluntarily agreed to by the railroad in advance of the board's order to show cause.

The railroad concedes on its brief that prior to the issuance of the order to show cause, the board "called an informal conference with the representatives of all the railroads operating in New Jersey and held discussions as to the adequacy of existing safety rules, regulations and practices," and "As a result of the conference and discussions the railroads voluntarily agreed to adopt and adhere to certain practices and the board was so notified in writing"; and that thereafter the board "issued its order to show cause and recited therein the results of the informal conference and discussions and set forth in said order the practices agreed to be observed, designating them as A to D(c)."

In asserting a denial of due process, for want of a hearing on notice "as to why an order should not be made directing it to adopt the practices" thus undertaken, the railroad urges, *inter alia*, that no hearing "as to why said practices should not be adopted, was in fact held," no evidence "*pro* or *con* said practices was taken," no findings of fact "as to the relation of said practices to the safe operation of the Railroad was ever made," and there is a "vast difference between agreeing voluntarily to adopt a certain practice and having the Board pre-emptorily to direct one to do certain things," and had the "carrier realized that the board was going to order them to do whatever they voluntarily agreed to do there is no doubt that they would have acted differently." How differently, and to what end, are not made to appear.

The only rational interpretation of this course of procedure is that, assimilated to the pretrial practice in ordinary litigation, this conference was designed to determine the unchallenged security requirements. The safety measures thus voluntarily assumed were embodied in the board's order to render them enforceable rather than subject to the will of the railroad, a course in keeping with the only reasonable understanding of the transaction. Certainly, it was understood that this voluntary undertaking was to be deemed an obligation that would render proof unnecessary and take the subject matter out of the litigated category. It could not

440

have any other meaning. There could not have been any other purpose. There was no suggestion *contra* during the board's proceedings; and there is no contention now that these requirements are in any sense arbitrary or unreasonable. To hold that there was a denial of due process here is to grasp the shadow and ignore the substance of the right.

Otherwise, I concur in the reasoning and result of the deliverance by Mr. Justice JACOBS.

*For modification and remandment*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—6.

*For modification*—Justice HEHER—1.