CITY OF PASSAIC, A MUNICIPAL CORPORATION, PLAIN-
TIFF-APPELLANT, v. PASSAIC COUNTY BOARD OF
TAXATION AND DIVISION OF TAX APPEALS, DEPART-
MENT OF THE TREASURY, DEFENDANTS-RESPOND-
ENTS.

Argued March 28, 1955—Decided May 2, 1955.

Mr. *William N. Gurtman* argued the cause for appellant.

Mr. *Ralph L. Fusco* argued the cause for respondents (*Mr. Grover C. Richman, Jr.,* Attorney-General of New Jersey, attorney).

The opinion of the court was delivered by

BRENNAN, JR., J. The City of Passaic appeals from the dismissal by the Division of Tax Appeals of its complaint under *R. S.* 54:2–37 seeking review, and the correction and revision, of the 1954 equalization table adopted by the Passaic County Board of Taxation.

■ The taxing scheme for the just apportionment of county taxes among the several municipalities of the county aims at the adjustment to the same relative standard of value of the aggregate sums of real estate ratables reported by the local assessors, and the fixing of each municipality's contribution to the county tax burden in the ratio of its adjusted aggregate to the total of adjusted aggregates. *Borough of Totowa v. Passaic County Board of Taxation,* 5 *N. J.* 454 (1950); 3 *Cooley, Taxation* (*4th ed.* 1924), *sec. 1195, pp.* 2390 *et seq.* The process does not result in any change in the individual assessments making up an aggregate; in that sense the adjustment of the total figure is artificial and is made solely for the purpose of assuring so far as possible that no municipality shall avoid or escape from its fair share of the common burden. An increase or decrease of the aggregate of any municipality simply alters the percentage shares of the county tax to be paid by all the municipalities of the county.

In the instant case the Passaic County Tax Board adopted without change the aggregate sums of the real estate assessments shown on the 1954 duplicates of 15 of the 16 taxing districts of the county. The only change was in the aggregate of $69,398,825 shown on the duplicate of the City of Passaic. That figure was increased $7,900,273, to $77,299,-098, and resulted in an increase of the same amount in the total of all aggregates from $451,885,617 to $459,785,890.

The result was to raise the City of Passaic's percentage share of county taxes from 15.36% to 16.81% and to reduce the percentage shares of the other 15 municipalities. As no change in individual assessments resulted, the increased sum was reflected in a higher tax rate for the City of Passaic and in lower tax rates in the other taxing districts.

## I.

The system of equalizing percentage shares by bringing the aggregates as near as may be to the same relative standard of true value is the expedient followed historically by the Legislature in face of the chronic failure of local assessors to assess property at a uniform standard of value. There has been general agreement for over a century that individual property valuations and assessments have been and are marred by the grossest inequities. See *Report of the Commission to Investigate Tax Assessments* (1912), appointed by *Joint Resolution No. 7, L.* 1912, *p.* 946; *Report of the New Jersey Commission on Tax Law Revision* (1939), created *L.* 1938, *c.* 95, *p.* 214; *The Revenue System of New Jersey, Report No. 6 of the Commission to Investigate County and Municipal Taxation and Expenditures* (1932); *The General Property Tax in New Jersey, Sixth Report of The Commission on State Tax Policy* (1953), authorized by *Joint Resolution No. 8, L.* 1952, *p.* 1176. Governor Woodrow Wilson in 1911 succinctly summarized the consensus in words adopted by Governor Driscoll as true today in his inaugural address of January 21, 1947:

"There is an uneasy feeling throughout the state, in which, I dare say, we all share, that there are glaring irregularities in our system—or, at any rate, in our practice—of taxation. The most general complaint is, that there is great irregularity as between individuals and corporations. I do not see how anyone can determine whether there are or not, for we have absolutely no uniform system of assessment. It would seem that in every locality there is some local variety of practice, in the rate, the ratio of assessment value to market value, and that every assessor is a law unto himself. Our whole system of taxation, which is no system at all, needs overhauling from top to bottom." *Sixth Report, supra, p.* ix (1953).

And not only have inequities between individual assessments in the same municipality long persisted, but local assessment practices have tended to keep down the percentage of true value of all assessments therein, with the result that there is a considerable variation in the average assessment ratios as between different taxing districts. The following comments from the 1912 report cited, confirmed in the 1953 State Tax Policy Commission report as also the current practice, attribute this practice to an open effort to minimize the municipality's percentage of tax burdens shared with other municipalities:

"There is a continual pressure upon the local assessor, especially where he is an elected official, to keep down the valuations in order to reduce the share of the county and state tax paid by his district." *Report, supra, p. 18.*

"The elected assessor, and even the appointed assessor, is under constant pressure to keep down the valuations in his district so as to reduce its share of county and state school tax. Even though he may try to equalize between individuals in his district, he has no inducement save pressure from the county board to increase his ratio of valuation so as to be on a par with other districts in the county. The local pressure is all the other way. Many assessors have freely admitted at the hearings that they refrained from raising valuations because they had no assurance that the other districts in the county would raise theirs, and they did not want their district to suffer." *Ibid.,* at *p.* 21.

True parity of the aggregates of the several municipalities cannot really be achieved without elimination of the inequities among individual assessments within all municipalities of the county. Quoting again from the 1912 report,—

"Some districts are assessing on what is termed a 40 per cent. basis; many at 50 or 60 per cent.; a few at 80 per cent. to 90 per cent. When such differences exist in any one county (as they do), it is obvious that the people of some districts are paying more than their share of county tax.

But this percentage basis does not mean or guarantee that every individual in the district will be placed on the same basis as his neighbor. While a district may average 50 per cent., some properties or classes of property may be assessed at 40 per cent. of value and others at 70 or 80 per cent." at *p.* 25.

And the State Tax Policy Commission report states,—

"Average assessment ratios are at best only estimates of the assessment experiences for individual properties which may or may not vary widely in individual cases. Even the most accurate average suggests a uniformity of experience within taxing districts which does not exist. It is in the nature and extent of variations in assessment ratios among individual properties which spell out the real estate tax environment in the State. These variations are serious and widespread. Their elimination is basic to the achievement of an equitable tax structure." *Sixth Report, p.* xxiv.

■ But the aggregates which are equalized in the apportioning of county taxes (presently there are no state or state school taxes raised from assessments of property) are only the aggregates of assessments against real estate. The process does not draw in the assessments or the aggregates thereof against personal property or second-class railroad property. Too, as mentioned, the increase or decrease of an aggregate of real estate assessments does not result in the change of any individual real estate assessment included in it. We have therefore been required to conclude in an earlier case that the Legislature did not intend that the duty of the county boards of taxation under *N. J. S. A.* 54:4–47 to revise, correct and equalize the individual personal and real property assessments shown on the several duplicates was requisite to the process of equalizing the aggregates of real estate ratables,

"* * * the Legislature intended to have the aggregate method provide for an equalization of real property valuations as among taxing districts solely for the purpose of apportioning to each district its fair share of the county tax burden and to have the individual assessment method provide the only basis for equalizing the county and local tax burden as among individual property owners, whether holders of real, second-class railroad, or personal property, within the same taxing district." *Borough of Totowa v. Passaic County Board of Taxation, supra,* 5 *N. J.,* at *page* 463.

We thus are not concerned in this case with the remedies of individual taxpayers from discriminatory assessment of their property, a matter dealt with in *Baldwin Construction Co. v. Essex County Board of Taxation,* 16 *N. J.* 329 (1954).

Imperfect as equalization of aggregates of real estate assessments is, the county and state agencies have the duty so to administer the equalization of aggregates process as best to secure the fair distribution of tax burdens common to municipalities; or, stated conversely, the duty is to minimize so far as possible the unfair distribution of the county tax which is one result of varying average assessment ratios among municipalities within the same county. When the standard of assessment was "full and actual value thereof," *L*. 1866, *c*. 487, *p*. 1079, the former Supreme Court held that the duty of the agency in utilizing the aggregate method was "to ascertain approximately, not accurately, the relative valuations, so that no apparent injustice will be done to any one [taxing district]." *State, Weehawken Twp., Pros., v. Roe*, 36 *N. J. L.* 86 (*Sup. Ct.* 1872). And this court has said:

"It is well recognized that absolute equality in taxation is a practical impossibility and that the Legislature in setting up tax procedures is not held to a standard of perfection." *Borough of Totowa v. Passaic County Board of Taxation, supra*, 5 *N. J.*, at *page* 464.

*Report No.* 6 of the 1932 Commission, *supra*, at *p*. 78, cogently observed that there will be "a closer approach to equitable taxation, if greater emphasis is put upon the assessment of property at full value than if this is neglected and the results are corrected by elaborate equalizing devices." The 1953 *Sixth Report* of the State Tax Policy Commission echoes this, at *p*. 141:

"The assessors' experience everywhere has proved that supervision or any other device cannot substitute for a good original assessment by the local assessor. * * *. * * * everyone has recognized that this costly and sometimes disappointing procedure [equalization of aggregates] cannot substitute for competent and effective local assessors who give continuous attention from year to year to the problem of equality of taxation."

It thus appears that equalization by the aggregate method is at best a substitute for local assessments at true value,

adopted for the express purpose of defeating the results of competitive undervaluation. The extent to which it achieves its ends is necessarily dependent upon the precision with which the average assessment ratios reflect the average degree of undervaluation.

## II.

The equalization of aggregates method has been a feature of our tax laws for 156 years. It first appeared in the Act of June 10, 1799; *Paterson's Laws, p.* 404 (*rev. ed.* 1800), which required the local assessors as a body to meet annually and by majority vote determine reasonable and just aggregate valuations for all townships and to fix the proportionate shares of state taxes accordingly. On occasions, particularly during the 19th Century, the Legislature has undertaken to make its own apportionment. There are statutes on the books which levy sums to be raised by taxes upon property and fix the amount of the contribution to be made by each county and the rate to be applied by the local assessors in raising the contribution from the property to be assessed. *Cf. An Act to raise by tax the sum of forty thousand dollars, L.* 1846, *p.* 158; also *L.* 1866, *c.* 471, *p.* 1043.

The provision of the 1799 act was carried into the first major revisions of the tax laws enacted by the Act of April 14, 1846; *Revised Statutes of* 1846, *Title* 35, *Taxes, p.* 1003 (1847); *Nixon & Elmer's Digest* (*3d ed.* 1861), *p.* 842. It was extended to county taxes by a supplement adopted as *L.* 1851, *p.* 271, and in that form also appears in *L.* 1866, *c.* 487, *p.* 1078. Up to that time the function was performed by the local assessors meeting together as a body. But meanwhile county boards of equalization were established in some counties, *e. g., L.* 1873, *c.* 697, *p.* 794 (Hudson County), *L.* 1900, *c.* 74, *p.* 134 (optional for any county), and, finally, the function was transferred in every county to the county boards of taxation created by *L.* 1906, *c.* 120, *p.* 210.

The equalization of aggregates function is defined in *N. J. S. A.* 54:3–17 and 18 of the present statutes. Each county

board of taxation is required annually to "ascertain and determine, according to its best knowledge and information, the general ratio or percentage of full value at which the real property of each taxing district is assessed according to the tax lists laid before the board," and to prepare "an equalization table showing the assessed valuation of the real property in each district, the ratio, or percentage, if any, by which the assessed valuation should be increased or decreased in order to correspond to true value, and the true value of the real property within the district as determined by it." The board on January 25 of each year must lay its proposed table before the local assessors and representatives of the governing bodies and afford them a hearing "for the purpose of determining the accuracy of the ratios and true valuations of property as shown in the equalization table, and the board shall confirm or revise the table in accordance with the facts." The hearings may be adjourned from time to time, but the equalization is to be completed before March 10.

The Legislature, for another purpose—the apportionment of distribution to municipalities under the State School Aid Act of 1954, *L.* 1954, *c.* 85, *p.* 526, *N. J. S. A.* 18:10–29.30 *et seq.*—has recently delegated a like, indeed, identical, responsibility to the Director of the Division of Taxation, although the Director's table lists every taxing district of the State. The Director is required by *L.* 1954, *c.* 86, *p.* 534, *N. J. S. A.* 54:1–35.1 *et seq.*, to promulgate his table of equalized valuations on or before the first day of October of each year to be used by the State Commissioner of Education in computing the amount each municipality shall receive in the way of school aid funds for the succeeding school year. The Director's table of equalized valuations has additional columns, but among them are columns for each taxing district showing: (1) its aggregate assessed valuation of real property (exclusive of Class II railroad property), (2) the average ratio of assessed to true value of such real estate in the taxing district, and (3) the aggregate true value of real estate in each taxing district determined on the basis of such ratios. *N. J. S. A.* 54:1–35.2.

384

III.

█ It is apparent that the function of the county boards of taxation under *N. J. S. A.* 54:3–17 and 18 and of the Director of the Division of Taxation under *N. J. S. A.* 54:1–35.1 *et seq.* (and also, as will presently appear, of the Division of Tax Appeals, both under *N. J. S. A.* 54:2–37 and 54:1–35.4 concerning review of the actions of the county boards and of the Director, respectively) is legislative or *quasi*-legislative in nature. *Cf. Bi-metallic Inv. Co. v. State Bd. of Equalization,* 239 *U. S.* 441, 36 *S. Ct.* 141, 60 *L. Ed.* 372 (1915); *People ex rel. Isbell v. Albert,* 403 *Ill.* 469, 86 *N. E. 2d* 237 (*Sup. Ct.* 1949). It is a function delegated by the Legislature to the county boards in lieu of direct apportionment by the Legislature itself, as instanced in the 1846 and 1866 statutes cited above.

█ The county board of taxation makes its initial and *ex parte* determination of the general ratio or percentage of full value at which the real property is assessed in each taxing district "according to its best knowledge and information." Administrative boards performing legislative or *quasi*-legislative functions are usually entitled to avail themselves of general information and expert knowledge which they may obtain in the performance of day to day administrative activities. *Pennsylvania Railroad Co. v. Dept. of Public Utilities,* 14 *N. J.* 411, 427 (1954); *Krauss v. A. & M. Karagheusian, Inc.,* 13 *N. J.* 447, 456 (1953). But in the case of the Director of the Division of Taxation, the Legislature has been more specific. *N. J. S. A.* 54:1–35.3 provides:

"True value for the purposes of this act shall be deemed to be valuation at current market prices or values, determined in such manner as the director may, in his discretion, select. The director shall determine the ratio of aggregate assessed to aggregate true valuation of real estate of each taxing district. He may make such determination by reference to the county equalization table whenever he is satisfied that the table has been prepared according to accepted methods and practices and that it properly reflects true value or a known percentage thereof for the several taxing districts in the county. The director, with respect to any and all taxing districts, may use the assessment ratios reported in the Sixth Report

of the Commission on State Tax Policy (Trenton, 1953) and may consider such other assessment ratio studies as may be available. He may make such further and different investigations of assessment practices as he may deem necessary or desirable for the establishment of the assessment ratios required by this act."

■ It is our view that the county boards of taxation not only may but should consult the 1954 law as to the kinds of information appropriately to be used in the construction of their own tables and also that they should take official notice of the Director's determination of aggregate assessed to aggregate true valuation of real estate of each taxing district of the county and give due weight to his conclusions.

■ The county board act does not specify any mode for arriving at equalization in the county table. It is a general proposition of law that "where a statute empowers a state board to equalize valuations for taxation, but does not point out the mode, any reasonable and efficient mode may be adopted." 3 *Cooley, Taxation* (4th ed. 1924), sec. 1196, p. 2395. The Director's ratios, determined as they must be from data of the quality specified in *N. J. S. A.* 54:1–35.3, are of necessity a more reliable indication of actual average assessment ratios than the estimates of the members of the county boards, however informed their judgment based upon generalized information or knowledge. In addition, we must surely impute to the Legislature an intent so far as possible to avoid the incongruous result of fixing a municipality's share of school aid moneys upon one computation of the aggregated true value of real estate and its share of the county tax burden upon another. Moreover, not only would the county board's taking of official notice of the Director's ratios be appropriate under general principles governing agencies exercising a legislative or *quasi*-legislative function, see *Pennsylvania Railroad Co. v. Dept. of Public Utilities, supra; Krauss v. A. & M. Karagheusian, Inc., supra,* but such action is especially appropriate in this instance since under *N. J. S. A.* 54:1–18 the Director has a part to play in the county board's function: when complaint is made to him by any taxing district of inequity in the county board's

table, he "shall render all possible assistance for the purpose of arriving at a fair and equitable adjustment of values."

## IV.

We digress at this point to note that in the instant proceeding the Division of Tax Appeals took official notice of only the existence of the *Sixth Report of the Commission on State Tax Policy* (*supra*) referred to in *N. J. S. A.* 54:1–35.3, but not of the assessment ratios reported therein. The stated ground was that "without evidence to substantiate the background and source of material or to otherwise prove the facts contained in the report, there was no basis, as we interpret pertinent law, to rule otherwise." We are not aware of any pertinent law compelling the rejection of the ratios in the absence of substantiating proof of the underlying facts. The law is rather the other way. The Legislature expressly authorized the Director of the Division of Taxation to use the assessment ratios in the report to construct his table, *N. J. S. A.* 54:1–35.3, and the Director used them without change in promulgating his 1955-1956 table, although he did so in part because there was insufficient time to gather additional data.

But apart from the question whether the Division was free to demand proofs of the facts underlying the determination of the ratios sanctioned by the Legislature for use in the determination of the Director's equalization table, the Division's ruling implied a fundamental misconception of the quality and quantity of proofs necessary to support the legislative action of an agency having the duty to promulgate a table, including such action by the Division when, as will appear, it must undertake to promulgate one because of the failure of a county board properly to do so. A board performing this function is not required to rest its conclusions upon proofs admissible under the common-law rules of evidence. That proposition was settled 83 years ago in *State, Weehawken Twp., Pros., v. Roe, supra*, 36 *N. J. L.*, at *page* 88; and see *Pennsylvania Railroad Co. v. Dept. of Public*

*Utilities, supra,* 14 *N. J.,* at *page* 426. The former Supreme Court rejected in the *Roe* case a contention that the action must be based on such evidence. Mr. Justice Van Syckel disposed of the argument as follows:

"* * * The statute will not bear this construction. No mode is provided for conducting such a proceeding and it is manifest that such a trial, if entered upon, would be practically without end. It would involve the taking of evidence and counter evidence as to the value of every piece of property in the county, besides the abatement to which every individual would be entitled for debts and non-taxables. It would require clear language to lead to the conclusion that the legislature intended to impose upon the [county board of taxation] an inquiry so extended as this, because if it is competent to enter upon it at all by the production of witnesses, nothing but the will of the contending parties could arrest the pursuit of it to its minutest details. In fact, if it must be determined by competent evidence, nothing could be settled without sufficient testimony to support it, and that would inevitably lead to an examination in detail of all the values in the county. This would be an impracticable and unreasonable interpretation of the clause in question." 36 *N. J. L.,* at *page* 88.

It appears from the *Sixth Report* that the assessment ratios therein are based upon an analysis of assessment results for some 21,275 residential properties and 2,356 commercial and industrial properties as compared with actual appraisal values made for mortgage purposes or as disclosed by corporate tax returns. These properties were distributed among 522 of the State's 567 municipalities. They represent a total assessed valuation of $218 million, or an over-all sample of 4.17% of the $5.2 billion of total assessed value for land and buildings in the State. *Sixth Report, supra, p.* 26. The manner and purpose of the compilation in furtherance of the legislative inquiry being made sufficiently removes any basis for suspicion of the trustworthiness of the study. *Cf. Krauss v. A. & M. Karagheusian, Inc., supra,* 13 *N. J..* at *page* 461. Certainly the ratios are based on data superior to the information found sufficient in *State, Weehawken Twp., Pros., v. Roe, supra,* 36 *N. J. L.,* at *pages* 88–89. namely, "If it shall appear to the board from the knowledge which each one possesses, aided by that derived from his associates,

that there is inequality, that inequality may be removed, according to their own best judgment, * * *." Doubtless a broader sampling of assessments and more current appraisals of the properties sampled are preferable, and it is contemplated under *N. J. S. A.* 54:1–35.3 that such are to be gathered by the Director. However, the sampling used by the legislative committee satisfied the Legislature of the propriety of the Director's use of the assessment ratios computed therefrom, and the infirmity therein, if any, goes to the weight to be given the ratios by the county boards and the Division, and not to their competency to be the subject of official notice. It should also be noted that on review of the Director's table in the Division of Tax Appeals, "the assessment ratios as promulgated shall be presumed to be correct, and shall not be revised or modified by the Division of Tax Appeals unless the complainant district shall present proof that upon all the evidence available such ratio or ratios could not reasonably be justified." *N. J. S. A.* 54:1–35.4.

## V.

This brings us to a consideration of the requirement of *N. J. S. A.* 54:3–18 for a hearing to be given on January 25 annually to the assessors and representatives of the governing bodies of the various taxing districts. That hearing is simply an extension of the legislative process of constructing the equalization table. Formerly when the assessors themselves constituted the board to perform the function the meeting was one at which the body would informally "by an interchange of views, be able to ascertain approximately, not accurately, the relative valuations, so that no apparent injustice will be done to any township." See *State, Weehawken Twp., Pros., v. Roe, supra,* 36 *N. J. L.,* at *page* 88. Such is still the essence of the purpose and object of the hearing today. The transfer of the functions from the assessors themselves to the county boards of taxation means only that the local authorities are not aware of the data upon which the board arrived at the table laid before the meeting.

It then is incumbent upon the board to inform the assembled assessors and representatives what data is relied upon to support the proposed assessment ratios and to afford fair opportunity to each municipality to refute such data. *Cf. Pennsylvania Railroad Co. v. Dept. of Public Utilities, supra.* A municipality's objections to its own or another municipality's ratio does not convert the meeting into a judicial controversy with the objecting municipality or between or among the municipalities. Nor is the objecting municipality saddled with the burden of proof to sustain its objections by proofs admissible under the strict common-law rules of evidence. This is not so much because administrative agencies are not required strictly to adhere to the common-law rules of evidence, as it is that the board adjudicates no controversy upon such a hearing. In the discharge of its legislative or *quasi*-legislative function, it is its duty to seek all enlightenment that will help it so far as possible to avoid errors in its ultimate determination of assessment ratios. *Cf. Krauss v. A. & M. Karagheusian, Inc., supra.* It therefore receives and should receive any proofs reasonably calculated to assist it in reaching a correct determination of the ratios and the board should not reject such proofs or refuse appropriate evidential weight to them out of an over-sensitive regard for their admissibility under rules of evidence applicable in judicial proceedings. See *Pennsylvania Railroad Co. v. Dept. of Public Utilities, supra; Krauss v. A. & M. Karagheusian, Inc., supra.* We repeat for emphasis that the entire process is legislative or *quasi*-legislative in nature, not purposed to adjudicate disputes with or among the municipalities but solely to enable the county board best and properly to perform its delegated function to secure as best may be a fair apportionment of the burden of county taxes among the municipalities of the county.

We have many times said, however, that agencies making legislative or *quasi*-legislative determinations ought to support their determinations by appropriate findings, showing the basis upon which they rest. See *Pennsylvania Railroad Co. v. Dept. of Public Utilities, supra,* and the author-

ities there cited. This has not been, but should hereafter be, the practice of county boards of taxation in these cases.

## VI.

When a county board increases an aggregate submitted by a local assessor, not "from any judgment formed by them that the valuation * * * was relatively less than it should have been," *State, Weehawken Twp., Pros., v. Roe, supra*, 36 *N. J. L.*, at *page* 89, but from considerations foreign to the relation of the average assessment ratio reflected therein to the average assessment ratios of the aggregates of the other taxing districts, the action is, in law, arbitrary and oppressive and the table must be set aside. This was the decision in the *Roe* case where the Hudson County Board of Assessors accepted the aggregates submitted by the assessors of all the taxing districts except Weehawken and increased the Weehawken aggregate 200%. The action of the Passaic County Board of Taxation in the instant case was the same. The aggregates of 15 of 16 taxing districts of the county were accepted, but that of the City of Passaic was increased $7,900,273. This was not done from any judgment that the average assessment ratio of the city was to that extent out of line with the other average assessment ratios, but solely to restore the city's aggregate to the amount reported for 1953. The city completed in 1953 an extensive revaluation of all properties to true value and adopted a policy of assessing the properties at 40% of true value. That percentage was chosen in the belief that it fairly represented the average ratio of assessments of real estate throughout the county. The result, however, was to reduce the 1954 aggregate by $7,900,273 under the 1953 aggregate.

Upon this set of facts the Division of Tax Appeals properly found that the "equalization table is erroneous." Indeed, the table was also erroneous on the face of it in the supposed judgment that 15 of 16 taxing districts operated upon identical assessment ratios. The opinions testified to before the Division by the local assessors that their assess-

ments were at true value may charitably be viewed as self-stultifying. Indeed the assessment ratios shown in the *Sixth Report* show a variation from 22.1% to 57% in the average assessment ratios of the taxing districts of Passaic County and a different ratio for every community. And if the county board of taxation actually believed that the aggregates of the 15 taxing districts reflected assessments at true value, the increase of the City of Passaic aggregate should have been to the true value figure submitted by the city; otherwise the increase of only $7,900,273 results in a table containing a relative valuation in favor of the city; and the undervaluation of the aggregate of a single district in relation to the other aggregates is itself fatal to a table, requiring that it be set aside and be replaced by a new and proper table. *Mayor, etc., of City of Bayonne v. Board of Commissioners of Appeals*, 46 *N. J. L.* 93, 97 (*Sup. Ct.* 1884).

## VII.

We come now to the role of the Division of Tax Appeals on the city's complaint for review of the county table. For almost a century there was no formal attempt at administrative supervision at the state level of the equalization function performed by the boards of assessors or the county boards of equalization where the latter boards were provided. Review was by *certiorari* in the former Supreme Court and was narrowly limited to the determination whether the action was arbitrary or oppressive. *State, Weehawken Twp., Pros., v. Roe, supra.* Administrative intervention through a state agency came in 1891 with the creation of the State Board of Taxation. *L.* 1891, *c.* 114, *p.* 189. Section 8 of that act empowered the State Board on complaint "of any taxing district or county respecting the action of any county board of equalization * * * to revise and correct the determination of such county boards of equalization by fixing the amount each taxing district shall raise, in just proportion according to the true value of the taxable property therein, and the assessment so corrected and determined by said state board of taxation shall be final and conclusive." In 1905

this body was succeeded by the Board of Equalization of Taxes of New Jersey, created by *L*. 1905, *c*. 67, *p*. 123. Its equalization function was precisely the same as that of the former board but was more expansively spelled out in section 3 of the 1905 law. Action by the board was initiated by the written complaint of any taxing district or county. If it appeared from said complaint "that any other taxing district or any other county that is by taxes contributing to a common cause with such complainant, is by inequality of valuation or otherwise avoiding or escaping from its fair share of the common burden," the board was required to "cause an investigation of such complaint"; "if it shall appear that the value of any property * * * bearing such common burden, is relatively less than the value of any other property contributing by taxation to a common burden * * * the said board may, after giving the notice * * * for the purposes of fixing or adjusting the proportion or quota of taxes to be levied as aforesaid, after a comparison of the values * * * add thereto such sum or amount as shall seem equitable, and to be warranted by such comparison and examination * * *." The consolidation of the State Board of Equalization with the State Board of Assessors in 1915 (the latter assessed railroad and canal properties) resulted in the transfer of the power to a new board, the State Board of Taxes and Assessments, *L*. 1915, *c*. 244, *p*. 438. Its functions were in turn transferred to the State Board of Tax Appeals created with the State Tax Department by *L*. 1931, *c*. 100, *p*. 166, *c*. 101, *p*. 170, *c*. 336, *p*. 823. The creation of the present State Department of Taxation and Finance carried with it the transfer thereto as of July 1, 1944 of the State Board of Tax Appeals, the State Tax Department and the State Tax Commissioner, renamed, respectively, the Division of Tax Appeals, the Division of Taxation and the Director of the Division of Taxation. *L*. 1944, *c*. 112, *p*. 287, *N. J. S. A.* 52:27B–48 and 52; see also *L*. 1948, *c*. 92, *p*. 511.

The various state boards exercised the equalization function as defined in the 1891 statute and expanded in the 1905 law. The definition was revised in form but not in substance

by *L*. 1934, *c*. 191, *p*. 465 and *L*. 1951, *c*. 113, *p*. 521 as it now appears in *N. J. S. A*. 54:2–37 reading as follows:

"A county equalization table may be revised by the board on complaint of any taxing district or taxpayer in the county, or on its own motion, but such review shall not suspend the apportionment of moneys or collection of taxes. No change shall be made in the table except after a hearing in the county, of which five days' notice shall be given by mail to the governing body of each taxing district. If, after the hearing, the board shall determine that the aggregate valuation of any district or districts as fixed by the county board was erroneous, it shall revise and correct the equalization table, and ascertain the difference between the amount of state and county taxes actually charged against each district in the county or distributed to it and the amount which should have been charged or distributed according to the corrected table. The difference shall be debited or credited, as the case may be, to each taxing district on account of its share of state and county taxes next due or distributable, as the case may be. The board may make all orders necessary to carry out the provisions of this section, but such review shall be completed before June tenth, annually. A certified copy of the revised and corrected table shall be transmitted to each official or board to whom the original table was required to be transmitted and also to the state tax commissioner."

The legislative intent as to the nature of the state body's function and duty as regards the equalization of aggregates in a county is clearly revealed by this legislative history. It is not, as the Division of Tax Appeals apparently viewed it in the instant case, an appellate function governed by principles of appellate review comparable to the review of appeals from individual assessments, see *N. J. S. A*. 54:2–35 and *N. J. S. A*. 54:2–39. The function drawn in by a municipality's complaint as to a county equalization table, or of the Division's own motion regarding such a table, is the identical function charged in the first instance to the county board. In short, when the county board has failed to do the job properly or at all, it becomes the duty of the State Division to do it to the end that there shall be as nearly as may be a fair apportionment of the county taxes. The initial step of the *ex parte* preparation of a table is omitted; the state body may not change the county board's table except after a hearing in the county of which five days' notice must be

given by mail to the governing body of such taxing district. This is a difference of procedure and not of substance. The complaining municipality is entitled to have the state body undertake the task upon a showing merely of error by the county board as to the aggregate of any one of the taxing districts. *Mayor, etc., of City of Bayonne v. Board of Commissioners of Appeals, supra; In re New Brunswick (City of New Brunswick v. Middlesex County Equalization Table), 25 N. J. Misc. 353 (Div. Tax App. 1947).* Indeed, without such a complaint, the Division should in the future be moved to undertake the task of its own motion whenever serious discrepancies appear between the ratios for the same year as they appear in the county board table and as shown on the table promulgated by the Director of the Division. Both the Division and the Director are in the same department of the State Government and the Division's duty to take official notice of the actions of the Director in the same department is clear. *Cf. Krauss v. A. & M. Karagheusian, Inc., supra.*

In the instant case the Division correctly found that the Passaic County Board's table was erroneous and conducted a hearing in the county. The Division failed, however, to promulgate a new table because of the misconception, based upon an erroneous decision of the former State Board of Tax Appeals, *Town of West Orange v. Essex County Board of Taxation*, 18 N. J. Misc. 383 (1940), that it had no duty to do so unless the City of Passaic, as complainant, established by proof meeting the standards of proofs admissible under common-law rules of evidence "what ratio does exist between the assessed valuations set out in the table under attack, and the true values of the properties." The Division concluded that the city had not met this burden and that therefore the county board table would not be disturbed.

If the Division's view were to prevail, the law, instead of correcting an admitted inequality in the apportionment of the common burden, would become the instrument for its perpetuation. The burden saddled upon a complaining municipality is an impossible one upon the face of it. The

Attorney-General on the oral argument acknowledged the difficulty of the burden imposed by the ruling, but would concede only that admissible proofs in the form of appraisals of at least 10% of all parcels in the county was the minimum requirement. Such appraisals are not required even in the assessment process. As noted at *pp.* 161–162 of the *Sixth Report, supra,*

"A tax assessor's office neither requires nor can afford the tailor-made appraisal that a private appraiser may often develop after days or even weeks of study of an individual property. In the assessment process, it is most important to derive methods of valuation which can be applied on a mass basis and can be expected on that basis to produce a proportionate distribution of the tax burden among the various properties, without necessarily reflecting the precise value of individual properties. This condition returns, of course, to the advantages of a formula versus a discretionary method of property valuation."

At all events, the Division erred as to the role it must play and the part of a complaining municipality in the proceeding. The Division's duty and the municipality's part are precisely those already described as regards the county board hearing under *N. J. S. A.* 54:3–18. The Division's role is spelled out in the well-considered opinion of the former President, now Judge, Waesche, in *In re New Brunswick (City of New Brunswick v. Middlesex County Equalization Table), supra.* We adopt Judge Waesche's view that, error appearing (as here) in the assessment ratio of a single municipality, it becomes the Division's duty to hold the prescribed hearing and to determine and promulgate a proper table. We subscribe fully to Judge Waesche's reasoning, 25 *N. J. Misc.,* at *page* 357, that:

"* * * Hence, the Division is a constituent part of the machinery of taxation created by the legislature to secure an equal and fair distribution of the burden of taxation, *Town of West Hoboken v. Board of Commissioners of Appeal,* 66 *N. J. L.* 162, 49 *A.* 9. Consequently, the Division of Tax Appeals has the jurisdiction and the duty to review the county equalization table and the aggregate valuation of each and every taxing district in the county. *The grant of the authority to equalize carries with it the authority to perform, as well as the duty to execute the details neces-*

*sary to the execution of the official function imposed.* [Emphasis supplied.] *Morrill v. Simpkins,* 53 *N. J. L.* 582, 22 *A.* 57.

Furthermore, the aforementioned statute, *R. S.* 54:2–37, *N. J. S. A.,* requires the Division of Tax Appeals to revise and correct the equalization table, if the Division finds that the aggregate valuation of *any taxing district* is erroneous, and to ascertain the amount of county taxes actually charged against *each taxing district* in the county and the amount which should have been charged to *each district* according to the corrected table. *The statute is mandatory in this respect.* [This emphasis supplied.] It says that the Division 'shall revise and correct the equalization table.' The word 'shall' is used here in the imperative sense. *Haythorn v. Van Keuren & Son,* 79 *N. J. L.* 101, 74 *A.* 502. Therefore, the Division must have the necessary jurisdiction to comply with the statute, and this jurisdiction cannot be taken from us [it] by any act of a taxing district since no complaint of a taxing district is necessary to enable this Division to act. * * *"

▆▆▆▆ At the hearing the Division, like the county board, acting under *N. J. S. A.* 54:3–18, may, indeed *should,* take official notice of the assessment ratios adopted by the Director of the Division of Taxation for the year in question, and, as well, any proceedings before the Division of Tax Appeals for review of such table, *N. J. S. A.* 54:1–35.4. The taking of official notice of any review proceedings involving the Director's table is especially appropriate, *cf. Pennsylvania Railroad Co. v. Dept. of Public Utilities, supra; Davis, Official Notice,* 62 *Harv. L. Rev.* 537 (1949), in view of the opportunity afforded every municipality by *N. J. S. A.* 54:1–35.4 to initiate a review or to be heard upon a review initiated by any other taxing district. Of course, at the hearing upon a county board table the Division, like the county board, must inform the municipalities appearing of the data of which official notice is taken and of other data to be considered in the preparation of the table, and afford an opportunity of refutation in the manner already described. Findings supporting the ultimate determination of the table promulgated should also be filed.

## VIII.

▆▆▆▆ The City of Passaic also complains of the refusal of the Division to determine an objection to the action of the

county board of taxation in increasing the assessment against Barry Gardens after the table of equalization was promulgated. But the issues as to individual assessments are not germane to the function of equalizing aggregates, and the action of the Division was proper.

## IX.

Two members of the Division were designated to hear the testimony, but, while one of those designated members, who is an attorney-at-law, sat throughout the entire hearing, other members of the Division were at times during the hearing substituted for the other designated member. *N. J. S. A.* 54:2–18 provides:

"The Division of Tax Appeals in the State Department of Taxation and Finance may, as occasion shall require, by order, refer to two or more of its members, at least one of whom shall be an attorney-at-law, the duty of taking testimony in a matter pending before it, and to report on such matter and the testimony so taken, to the division, but no determination shall be made therein except by the division. Said reports shall be in writing and signed by the members, and shall include, in substance, the facts and particulars of the testimony so taken, which written reports shall be public records and open to the inspection of the public. Stenographic notes shall be made of all testimony so taken, but the members of the board shall be qualified to make their determination after receiving the report of the members hearing the testimony, and without the necessity that the stenographic notes so taken shall have been reduced to writing; *provided, however,* that the testimony shall be reduced to writing at the request of any member of the division required to make a determination in any such matter."

We think the sense of this provision is that the members assigned to conduct a proceeding and who report to the full Division must hear the proceedings throughout. *Cf. City of Asbury Park v. Department of Civil Service,* 17 *N. J.* 419 (1955). Our decision in *Atlantic City Trans. Co. v. Director, Div. of Taxation,* 12 *N. J.* 130, 137, 140–141 (1953), does not support the course followed here. There a quorum of the Division heard all the evidence and adopted the findings as prepared for them by one of their number.

## X.

The judgment of the Division of Tax Appeals is reversed, and the cause is remanded with direction to revise and correct the 1954 Passaic County equalization table in further proceedings pursuant to *N. J. S. A.* 54:2–37 and consistent with this opinion.

VANDERBILT, C. J. (concurring). I concur in the result of the majority opinion, which represents an important step toward the solution of an ancient problem of great public interest. I would go farther and point out the statutory duty of the Division of Tax Appeals and the county board of taxation to see that taxes are not merely equalized at a percentage of true value, but are actually equalized at true value. As was pointed out in the dissenting opinion in *Baldwin Construction Co. v. Essex County Board of Taxation,* 16 *N. J.* 329 (1954), the entire statutory scheme of property taxation in New Jersey requires throughout assessment at true value. Not only must the local assessor assess all property at its "true value," *N. J. S. A.* 54:4–1, 2, 36, but the express duty of the county board is to supervise local assessors in order to ascertain that all property in the county is assessed at its true value:

"Each county board of taxation shall secure the taxation of all property in the county at its *true value,* in order that all property, except such as shall be exempt by law, shall bear its full, equal and just share of taxes." *N. J. S. A.* 54:3–13.

When we turn to the problem of equalizing aggregate assessments among taxing districts for the purpose of fixing the contribution of each to the county tax burden—the specific question involved here—the county board is charged with the duty to see that such aggregate assessments are at true value:

"Each county board of taxation shall annually ascertain and determine, according to its best knowledge and information, the general ratio or percentage of full value at which the real property of each taxing district is assessed according to the tax lists laid

before the board. It shall prepare an equalization table showing the assessed valuation of the real property in each district, the ratio or percentage, if any, by which the assessed valuation should be increased or decreased in order to correspond to true value, and the *true value of the real property within the district as determined by it.* A copy of the table shall be mailed to the assessor of each district, and be posted at the courthouse, at least one week before the hearings provided for in section 54:3–18 of this title." *N. J. S. A.* 54:3–17.

True value continues to be the criterion of the county board's responsibility in the annual meeting with the assessors:

"The county board of taxation in each county shall meet annually on January twenty-fifth for the purpose of equalizing the assessments of real property between the several taxing districts of the county. At the meeting a hearing shall be given to the assessors and representatives of the governing bodies of the various taxing districts for the purpose of determining the accuracy of the ratios and *true valuations* of property as shown in the equalization table, and the board shall confirm or revise the table in accordance with the facts. The hearings may be adjourned from time to time but the equalization shall be completed before March tenth. At the first hearing any taxing district may object to the ratio or valuation fixed for any other district, but no increase in any valuation as shown in the table shall be made by the board without giving a hearing, after three days' notice, to the governing body of the taxing district affected." *N. J. S. A.* 54:3–18.

The county board at each stage of its work is under a statutory duty to make true value the standard which it sets both for the local assessors and itself.

And as stated in the opinion of the court, the duty of the Division of Tax Appeals is to see that the county boards have performed their duty as to the equalization of assessments, *i. e.,* equalization of assessments at true value, *N. J. S. A.* 54:2–37.

VANDERBILT, C. J., and HEHER, J., concurring in result.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For affirmance*—None.