40 N.J. Super. 510 (1956)
123 A.2d 546
TOWNSHIP OF NORTH BERGEN, TOWN OF KEARNY, BOROUGH OF EAST NEWARK AND CITY OF BAYONNE, MUNICIPAL CORPORATIONS IN THE COUNTY OF HUDSON, APPELLANTS,
v.
DIVISION OF TAX APPEALS IN THE DEPARTMENT OF THE TREASURY OF THE STATE OF NEW JERSEY AND THE HUDSON COUNTY BOARD OF TAXATION, RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 21, 1956.
Decided June 27, 1956.
*512 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. Nicholas S. Schloeder argued the cause for appellant Township of North Bergen.
Mr. Robert J. McCurrie argued the cause for appellant Town of Kearny.
Mr. Saul G. Schulter argued the cause for appellant Borough of East Newark.
Mr. Leo Rosenblum argued the cause for respondent City of Jersey City.
The opinion of the court was delivered by CLAPP, S.J.A.D.
This is an appeal by the Township of North Bergen, the Town of Kearny, the Borough of East Newark and the City of Bayonne from a judgment of the State Division of Tax Appeals revising the tax equalization table adopted by the Hudson County Board of Taxation for the year 1955. See N.J.S.A. 54:3-17. Bayonne rests its case on the briefs and arguments of North Bergen and Kearny. There was no answering brief except that submitted by the City of Jersey City.
The equalization table, as revised by the Division, is based upon an analysis made by the Hudson County Tax Board of all sales of real property in the county between October 1, 1951 and December 31, 1954 (the parties do not consider how long a period should have been used. See Guide for Assessment-Sales Ratio Studies, Report of the Committee on Sales Ratio Data, National Association of Tax Administrators, 3 (1954)). Analyses of a somewhat corresponding nature were being conducted by other county boards, all under a program sponsored by the Director of the Division of Taxation.
The Hudson board in making its analysis excluded from consideration all sales made by or to a public body (Guide for Assessment-Sales Ratio Studies, supra, 6; cf. Davis v. *513 Division of Tax Appeals, 135 N.J.L. 250 (Sup. Ct. 1947)), or a fiduciary, or by one person to another person of the same surname. Then the board checked (it was said) "most" of the remaining sales in the period by communicating with the parties to the transaction or their attorneys, endeavoring thereby to eliminate sales not made at arm's length, sales involving personalty as well as realty and generally all sales not serviceable for the purposes of the study. Further see Guide for Assessment-Sales Ratio Studies, supra, 6-10, 34, 35.
After making these exclusions, there remained 12,872 sales out of all those taking place in the county during the 3 1/4 years above mentioned. The real properties involved in the 12,872 sales were then classified, according to municipality, in the following categories (which had been devised by the Director of the Division of Taxation): (1) vacant land; (2) residential property for the use of four families or less; (3) farm property (there seems to be none in the county outside of Secaucus); and (4) all other property, including chiefly apartment houses and industrial and commercial properties.
When the board was communicating with the parties to a sale or their attorneys, as above stated, it also sought to obtain the sales price and at the same time to verify that price by ascertaining the amount of the liens on the property at the time of the sale. For, the amount of the liens, added to the amount of the consideration indicated by the federal revenue stamps on the deed, constitutes the sales price (26 U.S.C.A. § 3482) that was used in the analysis. By checking with the parties and attorneys, an attempt was apparently made to detect any "over-stamping"  that is, the affixing of stamps in an amount greater than the law requires, in order to create an impression of a sales price higher than the true price. See Guide for Assessment-Sales Ratio Studies, supra, 12, 48.
The board next computed the ratio between the sales price of each of the 12,872 properties and its assessed value; and then considering each of the municipalities separately, it *514 found the average of all ratios in each of the three categories within that municipality (the category for farm property may be disregarded for the purposes of this case). The average ratio of the category was then multiplied by the total assessed value of the real property in that category within the municipality (the amounts of the total assessments in each category were supplied to the board by the local assessors on forms prepared by the State Director and designated SR-3); and the figure thus obtained was held by the State Division to be the true value of the properties in that category within the municipality. The Division added these figures in the three categories within the municipality in order to find the true value of all the property in the municipality.
The table below, dealing with the five municipalities above mentioned, shows in the first column the ratio between the assessed value of all real property in the municipality and the true value of the same as computed by the Division as above stated. The county board had added to this ratio a certain percentage  or (in the case of Hoboken and also, to the extent of .01%, Jersey City) subtracted a certain percentage therefrom  in order to create a so-called cushion because of "information available to us in the back of our heads as to the value of property in the County."

 Ratio of Total Assessed Values to Total True Values
 Hudson County Board's State Tax Director's
 Tax Board's final Policy 1954 table
 computation determination Com'n., in connection
 based solely including Sixth with State
 on its sales the Report School Aid
 study. State cushion
 Division's
 final determination
North Bergen 53.12 57 51 50.5
Kearny 46.08 50 41 41.4
East Newark 49.40 52 53.8
Bayonne 56.90 60 50 49.5
Jersey City 70.01 70 67 67.5

*515 The ratios in the third column  those taken from the Sixth Report, 1953, of the New Jersey Commission on State Tax Policy  were based on 1,339 properties in Hudson County (Sixth Report, 169) valued at least in part for the year 1950 or 1951 (Sixth Report 39, 67, 86, 87)  a considerably narrower and less contemporaneous base than that employed in the Hudson County Board's study (which involved, as above stated, sales prices of 12,872 properties for the three and a quarter years ending January 1, 1955). The Director's 1954 table was promulgated on October 1 of that year. Because of an insufficiency of time between June 30, 1954, when N.J.S.A. 54:1-35.1 to 54:1-35.5 became effective, and October 1, 1954, the Director, pursuant to the statute, made use of the ratios shown in the Sixth Report, though restoring fractions eliminated from the report. (The Director's 1955 table, based on his independent study of current sales ratios, was not promulgated until October 1, 1955, after the entry of the judgment below.)
Before turning to the issues at hand, we should call attention to an opinion just written for this court by Judge Francis, which deals with certain general aspects of the subject of equalization and to that extent supplements this opinion. Carteret v. Division of Tax Appeals, 40 N.J. Super. 439 (App. Div. 1956).
We consider first a contention that is pointed up by the table appearing just above, namely, the contention that the Division erred when it eliminated the so-called cushion. This cushion was introduced by the county board in order to (to use the words of the president of the board) "soften the blow" that fell as a result of the Board's attempt to inject some measure of rationality in the haphazard equalization process once existing. No one attempts to justify the cushion logically, and it becomes therefore at best a vague estimate, of a sort somewhat like that deprecated in Borough of Little Ferry v. Bergen County Bd. of Taxation, 18 N.J. 400, 405, 406 (1955).
In fact, the president of the county board admitted before the State Division that the figures in the first column *516 of the above table are more accurate than those in the second. Moreover, he testified that he had no reason to believe there were errors in the study warranting the cushion:
"As a matter of fact I think if I had to do it over again * * * I would let the mathematical averages stand * * * I think the great virtue of the sales ratio study is that it reduces the element of judgment to an absolute minimum; and I must admit that, by adding this percentage in here, we have added back an element of judgment which might very well be left out."
Clearly the State Division did not err when it eliminated the cushion.
We come next to a much more fundamental contention, viz., that any method of equalization, which rests (as does the method used below) exclusively on sales prices, is arbitrary, and therefore invalid. Appellants point out that N.J.S.A. 54:3-17 requires the county board to prepare an equalization table based on the "true value" of the real property in each district. They claim that under a settled rule sales prices are not taken as an exclusive criterion in determining true value when dealing with an individual assessment and that the rule should be no different when dealing with aggregates. Harborside Warehouse Co. Inc. v. Jersey City, 128 N.J.L. 263, 265 (Sup. Ct. 1942), affirmed 129 N.J.L. 62 (E. & A. 1942); L. Bamberger & Co. v. Division of Tax Appeals, 1 N.J. 151, 153 (1948); Hackensack Water Co. v. Division of Tax Appeals, 2 N.J. 157, 162 (1949). In elaboration of the argument it is said that there are, broadly speaking, three criteria for ascertaining true value: first, sales price of either the property in question or comparable properties; second, "economic" considerations  that is, primarily a capitalization of net income, actual or theoretical; and, third, reproduction cost, less depreciation and obsolescence; that though there are other criteria, they may be regarded as merely adjuncts of those enumerated. Cf. N. Bergen in Hudson County, Twp. of, v. Bergen Boulevard Holding Co., 133 N.J.L. 569, 572-574 (E. & A. 1945). Proceeding from the premises stated, the appellants *517 argue that the two criteria last enumerated must be used as a check against sales prices, when equalizing aggregates.
The argument at times seems to be that the Hudson County Board, when equalizing aggregates, is itself under an obligation to appraise every property in the county, using the three criteria conjunctively insofar as they are appropriate. See Lee, "State Equalization of Local Assessments," 6 Nat'l. Tax J. 176, 180 (1953) as to states where reappraisals have been made by equalization agencies of all property within their jurisdiction. We need not stop on this question. The Supreme Court, in its definitive opinion dealing with equalization of aggregates, has sanctioned the use of samples, reasonably selected, provided there is a reasonable basis for arriving at the true value of the samples chosen. City of Passaic v. Passaic County Bd. of Taxation, 18 N.J. 371, 385-388 (1955).
However, the main thrust of the argument here seems to be, not an attempt to preclude the use of samples, but rather a contention that sales prices cannot be made the sole criterion in determining the true value of the samples chosen. It is said that, generally speaking, sales prices approximate true value only in the case of apartment houses and such commercial properties as are bought for investment and not for use, for investors by and large are not only informed buyers, but are free of the compulsions which often control those who buy for their own use.
Aaron K. Neeld, Director of the State Division of Taxation, writing for the magazine, New Jersey County Government, 9, 14, March 1955, states his answer to this argument against the exclusive use of sales prices in this connection:
"Concededly, sales statistics will not always produce an infallible ratio, but sales when properly analyzed, investigated and classified, provide the only feasible solution to the equalization problem, having regard for costs and the need for relatively quick results. It would be economically impossible to determine assessment ratios by the appraisal process, not to mention the fact that the time lag, on a state-wide basis, between start and completion would make such a project impracticable." *518 A practical consideration here is that appraisals, subjective in nature, cannot be made by an equalization agency itself, unless substantial moneys are appropriated to the agency for the purpose. Moreover, since values do not remain static, appraisals would have to be secured annually or at least periodically. Mr. Neeld continues:
"Until a more effective method is developed sales must constitute the principle basis for the determination of assessment ratios. True, refinement in the results may be had if that process is augmented by some appraisal data in the commercial and industrial property classifications where sales are generally scarce or non-existent, but the fact remains that for the time being sales data must provide the most effective basis on which to annually determine equalized valuations of aggregate ratables."
It is said by Lee that of the 31 states which have an inter-county equalization program, one-fourth rely entirely on sales prices realized on bona fide sales, one-fourth rely on appraisals made apparently by the equalization agency and the remaining one-half
"utilize both sales data and appraisals, often relying on the latter to gain information about areas or classes of property for which the sales data provide an insufficient sample."
Lee, supra, 180.
In the Guide for Assessment-Sales Ratio Study, supra, 1, it is said:
"Techniques have been developed that will measure non-conformity among types of property and valuations in the level of assessment within different areas with a fair degree of accuracy. The technique most commonly used for this purpose is that of determining sales ratios, that is, the relation of the assessment to the selling price of particular items of property."
It is pointed out in this Guide (p. 4) that when sales data are supplemented with subjective appraisals
"* * * it should be recognized that the judgment of one appraiser is being compared with that of the assessor, another appraiser, a comparison lacking the objectivity of one based on sales data."
*519 Mitchell, writing in 1948 (see the Guide, p. 32), contrasts the sales price method of equalization with methods based on (a) appraisals by some agency not associated with the assessor, (b) appraisals relying on prospective earnings as indicated by analytical forecasts or simply by past earning records, and (c) appraisals dependent upon reproduction cost less depreciation and obsolescence; and he then goes on to say:
"At the present time, the data most generally available and usable for measuring nonuniformity are the sales prices arrived at by negotiations between willing buyers and sellers. Facts developed from such data have been used for several decades by assessors, state supervisory agencies, and taxpayers."
It will suffice here to hold that a method of equalizing aggregates is valid, even though it is based exclusively on sales prices  unless its application in a particular situation is prejudicial to a municipality. In this case (as will appear herein) there has been no sufficient indication of such prejudice, or in any event there is nothing before us warranting a reversal. Hence we find it unnecessary here to decide what circumstances indicative of prejudice will place upon equalization agencies an obligation to supplement or spotcheck sales prices through the use of appraisals or other data. Cf. the spotchecks referred to in Borough of Little Ferry v. Bergen County Bd. of Taxation, 18 N.J. 400, 404 (1955). In the Sixth Report of the Commission on State Tax Policy, xxii (1953), it appears that
"The values used were actual appraised values for all residential properties; and a combination of reproduction less depreciation, sales prices, and appraised values for mortgage purposes on commercial and industrial properties."
Further, see City of Passaic v. Passaic County Bd. of Taxation, 18 N.J. 371, 387 (1955).
We turn next to several arguments of the appellants which, conceding arguendo the validity of a sales-ratio method of equalization generally, nevertheless advocate certain *520 exceptions or refinements in the method, particularly because of circumstances presented in their communities. Thus, North Bergen insists most strenuously that the assessed value of properties of the township within the second category (namely, residential properties accommodating not over four families) equals 100% of their true value, and not 44% thereof as indicated by the sales-ratio method used here. North Bergen points out that 54.7% of its ratables fall within that category. Proportionately it has four times as much property in the category as Hoboken, and (it is said in the brief) three times as much as Harrison, roughly twice as much as West New York, Jersey City or East Newark, and one and three-quarter times as much as Bayonne or Union City. It argues that a shortage of homes today has brought about a temporary inflation in price which in no way affects their true value; for the law ascribes to true value a measure of permanency, which is indifferent to such price movements. Hackensack Water Co. v. Division of Tax Appeals, 2 N.J. 157, 163 (1949); City of Newark v. Township of West Milford, 9 N.J. 295, 307 (1952); see City Holding Co. v. State Board of Tax Appeals, 127 N.J.L. 168, 169, 170 (Sup. Ct. 1941), referring to the depression starting in the 1930s. The point of the argument is that where a municipality (such as North Bergen) has proportionately much more residential property than other municipalities in the county, a temporary inflation affecting only residential properties operates seriously to distort a determination of true value in that municipality through a sales ratio method.
We need not stop to consider whether, because of practicalities inherent in any equalization process at least in 1955, the State Division and the county boards may be permitted to use in that year a sales ratio method which would inevitably reflect temporary inflations and deflations, even though individual assessments should not be affected by such fluctuations in price. Nor need we consider whether satisfactory proof could ever be adduced, establishing either that a current inflation or deflation will be temporary or that the *521 inflation or deflation has increased or decreased the price (or the cost of the property or its rental) by a determinable percentage. For the force of the whole argument, insofar as it affects North Bergen, seems to us to have been considerably dissipated by the admissions of North Bergen's assessor, while on the stand.
This expert stated that he has many times appraised residential properties in North Bergen for the Veterans Administration in connection with purchases made by veterans; that in making such an appraisal he has used all appropriate means of ascertaining (what the Veterans Administration terms) "reasonable value," including reproduction costs, comparable sales and actual or estimated rentals, though without attempting to state expenses or to capitalize income; and that, generally speaking, the "reasonable value" of such properties so appraised equals approximately their true value as determined by the sales ratio study, even though their assessed values come to only 44% of the true value so determined. In the light of this testimony (among other things), the State Division rejected North Bergen's entire argument that the assessed values of its residential properties averaged 100% of true value in 1955; and we see no basis for setting aside the Division's determination.
We turn to another of North Bergen's arguments which accept the sales-ratio method in the main, but press for a modification of it in some respect. The point may perhaps be most readily brought out by the example (an extreme case) which North Bergen relies upon. A certain property in Jersey City was assessed at $2,300 and sold for $8,000  resulting in a sales price ratio of 28.7%; whereas another property in Jersey City was assessed at $454,000 and sold for $400,000, resulting in a ratio of 113.5%. If these were the only sales within a single category, the average ratio governing the category would be 71%; and under the method used below, the true value of the two properties in the category would then be $323,973. North Bergen argues that the little sale made at a price four times true value has distorted the average.
*522 Stated in general terms, the argument is this: the county board should not have averaged the ratios in each category in order to ascertain the sales ratio of the properties in that category; it should have added the assessed values of all properties in the category that were sold and then have added the sales prices of the same, and found the ratio between these two totals. So in the example given, the assessed valuations of the two properties total $456,300, the sales prices total $408,000, and the average ratio would come to 111% (not 71%) and the true value of the properties to $506,493 (not $323,973). We are informed, off the record, that this is the method currently employed by the State Director. Further, see Guide for Assessment-Sales Ratio Studies, supra, p. 23.
On the other hand, we should point out that under the North Bergen proposal "a single large transaction can unduly affect" (see the Guide p. 23) the sampling process. This might be the case, for example, if there were 26 sales within a category  25 of the properties selling at prices totalling $500,000, each producing a sales ratio 60-40% of assessed value, and a 26th property selling at $3,000,000, but with a sales ratio of 90%.
Suffice it here to hold that the method used below in this case (namely of averaging sales ratios) does not seem to have been prejudicial to North Bergen; for though it would have been a simple thing to do, North Bergen does not compute for us how this revised method would have affected its sales ratio; nor does it give us the exhibits or figures enabling us to do so.
Kearny also urges a modification in the sales ratio method used below, particularly as it affects Kearny. It claims that the fourth category, which includes primarily apartment houses, business and industrial properties, should have been divided up so as to create, at least in Kearny, a separate category for industrial property. Industrial property constitutes 52% of all the ratables in Kearny; and in fact four industrial properties, valued at over $20,000,000, make up 30% of all the ratables in the town. Of the 136 sales *523 used to establish a sales-ratio for the fourth category in Kearny, only one consisted of industrial property. The ratio between the assessed value of this property and its sales value amounted to 86.4%  although the average ratio of the 136 sales is 51.93%. Kearny's argument is that this indicates that it assesses industrial properties at a higher ratio to their value than commercial properties and apartment houses; and hence that the method used below has resulted in undervaluing industrial properties in Kearny.
It may be assumed that a breaking up of the fourth category into separate categories would serve to minimize error if, as alleged, industrial properties are assessed at a higher ratio to their value than commercial properties or apartment houses. Guide for Assessment-Sales Ratio Studies, supra, 58. In such a case, further stratification, as it is called, may be warranted in one municipality if it does not result in giving to that municipality an undue advantage. But here we have no sufficient proof or assurance that valuations of industrial properties in Kearny are assessed by and large at a substantially greater percentage of true value than commercial properties or apartment houses. Indeed, Kearny in its brief states that all the improvements on the above-mentioned four industrial properties, valued at over $20,000,000, consist
"of old special purpose buildings * * * which, from common knowledge and experience, reduces their sales value to, comparatively speaking, zero."
Sales value is surely, to some extent, an indicium of value. If most of the industrial properties in Kearny have a sales value of, "comparatively speaking, zero," there may be reason to question Kearny's assertion that all industrial properties should be assigned a sales-ratio of 86.4%. In any event, we are not persuaded that an arbitrary result was reached by the State Division here, when it refused to provide a separate category for industrial properties.
We come next to East Newark's contention, which presents a still more unusual situation. The total assessed value of *524 East Newark's real property amounted to $2,600,000 in the period under review, about .32% of all such ratables in the county. Of the 12,872 sales analyzed by the Hudson County Board as above stated, only 42 were of East Newark properties, about .32% of the sales analyzed. East Newark's principal contention has to do with one industrial property located in this municipality, which is said to be "of civil war vintage" and which is assessed at $1,364,000, 52.2% of all of East Newark's ratables. There were no sales of industrial properties included in the 42 samples stated, though there were 11 sales in the fourth category.
Where there are no samples in the whole category or where the sales ratio method may lead to an injustice, the county board and (see City of Passaic v. Passaic County Bd. of Taxation, 18 N.J. 371, 391-396 (1955)) the State Division may very properly make such supplemental studies, and, if warranted, such modifications in the method, as may reasonably be appropriate. On the other hand, this court on an appeal will generally not interfere where no prejudice has been shown.
East Newark, however, claims that prejudice has been shown here. The industrial property in question is now owned by a company which leases portions thereof to a number of concerns. Before the county board and also the State Division, East Newark produced a witness who valued the property at $1,037,251; but both bodies for good reasons decided not to accept his conclusion, and we see no basis whatever for interfering with the decision.
The county board, after rejecting this witness' opinion, then itself put a valuation on this property of $2,335,000, basing this valuation on an inspection made by the board president, while driving by the property in an auto (he never went inside). The figure he came up with happened to coincide just precisely with the board's preconceived notion (including the cushion above stated) that all East Newark's property should be assessed at 52% of true value. The State Division properly rejected this valuation.
*525 East Newark now asks us to remand the case so that it might submit more adequate proof as to the value of this one big industrial property. However, at a pretrial conference before a panel of the Division, the panel suggested to East Newark's counsel that he should give consideration to establishing the value of this property by adducing proof as to its net income and then capitalizing the income; the implication is that the Division might have regarded this as an acceptable method of establishing value in this case. In any event, East Newark did not adopt the suggestion. Indeed, the county tax board also suggested to East Newark that it present proof of a like nature; but East Newark "didn't see fit to give it to" the board. East Newark seems almost to have avoided presenting the suggested proof. Under the circumstances we see no justification now for acceding to the municipality's application to have the case remanded for further proofs on the subject.
We have thus far considered several proposals to modify or supplement the sales-ratio method used below in a certain particular, especially in its application to these municipalities. The final point dealt with here is of a somewhat different nature: North Bergen urges that the sales-ratio method be not applied to any municipality which has undertaken a revaluation of the real property in its confines.
Citing City of Passaic v. Passaic County Board of Taxation, 18 N.J. 371, 381 (1955), North Bergen argues that there is no "`substitute for a good original assessment by the local assessor.'" Further see Murray, "Improvement in Real Estate Taxation Through Assessment-Sales Studies," 5 Nat'l. Tax J. 86 (1952). North Bergen points out that in 1949 and 1950 it undertook at a cost of $50,000 to have all real property in the township reappraised by an expert appraiser. It seems to be claimed that the values fixed by him would not give North Bergen an undue advantage over other municipalities where true value is determined under the sales ratio method; and it seems also to be largely assumed that the values in 1949 and 1950 constituted true value in 1955. In fact, the argument seems to be that the county *526 board and the Division should accept the opinion of any qualified expert making a revaluation.
We are unpersuaded. We think we need say no more than that the county board or the Division must have a reasonable basis for assuring itself that the values fixed under a revaluation program represent true value. The Division refused to accept the values established in North Bergen on the revaluation of its property, and we see no sufficient basis for our interference in the matter.
Affirmed.